2552

The STATE, Respondent v. Kenneth RODRIQUEZ, a/k/a Michael Frasier, Appellant.

(476 S.E. (2d) 161)

Court of Appeals

*Robert L. Gailliard,* Charleston, *for appellant.*

*Attorney General Charles Molony Condon, Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Salley W. Elliott,* and *Assistant Attorneys General Rakale B. Smith* and *Caroline Callison Tiffin,* Columbia; and *Solicitor David P. Schwacke,* of North Charleston, *for respondent.*

Heard Apr. 2, 1996.

Decided Aug. 12, 1996.

CURETON, Judge:

Kenneth Rodriquez, also known as Michael Frasier (Rodriquez), was convicted of trafficking in cocaine, possession of cocaine with intent to distribute within proximity of a school, possession of crack cocaine with intent to distribute within proximity of a school, simple possession of marijuana, and unlawful carrying of a pistol. He appeals from the trial court's denial of his pretrial motion to suppress introduction of the contraband into evidence on the ground it was acquired through an unconstitutional search and seizure. We reverse.

## I. FACTS

Incident to his participation in a drug interdiction program, Detective Melvin Cumbee, of the North Charleston Police Department narcotics unit, inspected the train manifest at the Charleston Amtrak station on March 23, 1993. Cumbee noticed the name "Kenneth Rodriquez" on the manifest and requested Rodriquez's itinerary. According to Cumbee, the name "Rodriquez" was significant to him because several months earlier the police had arrested a drug courier with a different first name but whose last name was Rodriquez. The courier stated his brother also transported drugs using the

name Rodriquez.[1] Upon inspecting the itinerary, Cumbee noted Kenneth Rodriquez was returning to Charleston from New York on March 24, he had paid cash for the trip, and his turn-around time in New York City was short. Cumbee also phoned the call-back number listed on the manifest, but the person who answered stated he did not know Kenneth Rodriquez. In addition, Cumbee spoke with a confidential informant who gave him "a very vague" description of Rodriquez and told him he believed Rodriquez made frequent train trips to New York, usually paid cash, and the same individual usually brought him to the train station and picked him up upon his return. The confidential informant did not give Cumbee any information indicating Rodriquez went to New York to but drugs or that he would be carrying drugs upon arriving back in Charleston. Cumbee relayed the information he gather from the train manifest, itinerary and confidential informant to other members of the narcotics unit.

Detective James Denney, also of the North Charleston Police Department, testified he received information from Cumbee concerning Kenneth Rodriquez and, as a result, went to the Amtrak station on March 24 with Detective James Roberts to meet the train upon which Rodriquez was to return. Both detectives were working undercover and arrived at the station approximately forty-five minutes before Rodriquez's train was scheduled to arrive. Denney then spoke with an attendant at the station and learned the train was running approximately one hour behind schedule. According to Denney, he and Roberts waited at the station for the train to arrive.[2] While waiting for the train, Denney spoke with the confidential informant and received a "full description" of the subject.

When the train arrived, Denney saw Rodriquez disembark and meet another man. Rodriquez was carrying four bags, two of which he handed to the other individual. Denney and Roberts followed the men out of the front doors of the train station and approached them in the parking lot. Denney testi-

---

[1] The police later determined there was no connection between the appellant herein and the man the police apprehended several months earlier.

[2] Detective Roberts, who was sequestered during Denney's testimony at the suppression hearing, gave a different account. According to Roberts, he and Denney left the station after learning the train was running behind schedule and returned thirty minutes later.

fied he never blocked the subjects' path but approached them from the side and identified himself as a police officer. He advised Rodriquez he had received information Rodriquez might be carrying contraband and asked if he could pat him down for weapons.[3] Rodriquez refused the request. At the same time, Roberts was talking to the other individual. According to Denney, he asked Rodriquez a second time if he could pat him down and he refused. He also asked Rodriquez if he could look through his luggage and, again, Rodriquez refused. Rodriquez asked Denney why he was being detained and, according to Denney, was told he was not being detained and was free to leave at any time. Denney stated Rodriquez appeared very nervous, particularly during the initial stages of the encounter. After about five minutes, Denney and Roberts switched places so that Roberts could speak with Rodriquez and Denney could speak with the other individual. Denney stated Rodriquez voluntarily remained with him and Roberts for approximately thirty minutes although he repeatedly asked why he was being held and was repeatedly advised he was not being detained and was free to go. However, on cross-examination, Denney admitted that after Rodriquez refused to consent to a search, he told Rodriquez that it would only take a short time for the detectives to search his bags and "if nothing was found, [he] would be clear to go." [4]

Roberts testified he and Denney identified Rodriquez from the description given them by the confidential informant and followed Rodriquez and the man who met him as they left the train station. According to Roberts, he and Denney approached the subjects from behind and identified themselves as police officers. Roberts stated he heard Rodriquez refuse Denney's request for a pat down and to search his bags. Roberts also stated Rodriquez asked Denney three times why he was being detained and each time Denney informed him he

---

[3] Denney did not testify the confidential informant gave him any information indicating Rodriquez might be carrying contraband, and as noted above, Cumbee did not receive any such information from the informant. Thus, Denney was presumably referring to the information Cumbee relayed to him regarding the man named Rodriquez whom the police had arrested on a prior occasion.

[4] At trial, Rodriquez testified he asked the officers at the train station why they were holding him and they replied "[w]e want to search your bags. And as soon as we search your bags, you will be free to go."

was free to leave. Roberts testified he talked to Rodriquez for approximately thirty minutes after he and Denney traded places. Accordingly to Roberts, Rodriquez asked him five times why they were holding him. He stated he told Rodriquez he was not being detained and he "could leave at any time, but then I would again state, 'No, but I would like for your to cooperate with me before you leave—if you would, let me check your person and your baggage. You know, you are talking five minutes and you would be gone.' "

At some point while Roberts was talking to Rodriquez, Denney contacted Cumbee and a canine drug detection unit. Shortly thereafter, Detective Kenneth Hagge, along with several other officers, arrived and told Rodriquez he was going to conduct a pat-down search. Rodriquez lifted his hands in a gesture to indicate "why" and Hagge saw a pistol in his waistband. Hagge then arrested Rodriquez and seized the pistol. Upon searching Rodriquez's bags, police officers found quantities of various drugs and drug paraphernalia.

At a pretrial suppression hearing, Rodriquez argued the contraband was the fruit of an unconstitutional search and seizure and was therefore inadmissible. The trial court denied the motion to suppress, finding Rodriquez's encounter with the police officers never amounted to a "seizure" requiring justification under the Fourth Amendment. Specifically, the trial court found "[c]learly there was a qualification insofar as, 'All you need to do is cooperate and you will be out of here,' but there was never a suggestion that 'If you don't cooperate, you can't be out of here.' " The trial court also found that although "thirty minutes is a period of time that raises a flag to some extent . . . considering the totality of the circumstances, I would find it does not violate the Fourth Amendment rights of this individual. . . . [Rodriquez] has had his freedom; he was offered it."

## II. DISCUSSION

Rodriquez essentially argues he was detained by the police at the Amtrak station and that the detention amounted to a seizure of his person. He further asserts the seizure was unreasonable in scope and duration and was therefore tantamount to a de facto arrest which was in turn violative of his Fourth Amendment rights. Ordinarily, an appellate analysis

of this issue would include a de novo review of all of the circumstances in order to determine whether, if an arrest did in fact occur, the arrest was support by probable cause. *See Ornelas v. United States,* — U.S. —, 116 S.Ct. 1657, 134 L.Ed. (2d) 911 (1996) (holding that appellate courts should conduct de novo reviews of trial court determinations of reasonable suspicion to make stops and probable cause to conduct warrantless searches). Here, however, it is undisputed the police did not have probable cause to arrest Rodriquez until Detective Hagge saw the pistol in his waistband, after the allegedly unconstitutional seizure had already occurred. Therefore, our inquiry on appeal is limited to 1) whether the police "seized" Rodriquez within the meaning of the Fourth Amendment; and 2) if a seizure did in fact occur, whether the seizure was reasonable in scope and duration.

### A. Detention

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . . U.S. Const. amend. IV.

> No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.

*Union Pac. Ry. Co. v. Botsford,* 141 U.S. 250, 251, 11 S.Ct. 1000, 1001, 35 L.Ed. 734 (1981). Generally, police seizures are *per se* unreasonable within the meaning of the Fourth Amendment unless such seizures are accomplished pursuant to judicial warrants issued upon probable cause. *United States v. Place,* 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed. (2d) 110 (1983).

However, it has long been recognized that "[n]ot all personal encounters between policemen and citizens involve 'seizures' of persons thereby bringing the Fourth Amendment into play." *State v. Culbreath,* 300 S.C. 232, 237, 387 S.E. (2d) 255, 257 (1990) (citing *State v. Foster,* 269 S.C. 373, 237 S.E. (2d) 589 (1977). Indeed, "[t]he purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry but 'to prevent arbitrary and oppressive interference by enforcement officials with the privacy

and personal security of individuals.' " *United States v. Mendenhall*, 446 U.S. 544, 553-54, 100 S.Ct. 1870, 1877, 64 L.Ed. (2d) 497 (1980) (quoting *United States v. Martinez-Fuerte*, 428 U.S. 543, 554, 96 S.Ct. 3074, 3081-82, 49 L.Ed. (2d) 1116 (1976). A person has been "seized" within the meaning of the Fourth Amendment "whenever a police officer accosts [the] individual and restrains his freedom to walk away." *Terry v. Ohio*, 392 U.S. 1, 16, 88 S.Ct. 1868, 1877, 20 L.Ed. (2d) 889 (1968); *Sikes v. State*, — S.C. —, —, 448 S.E. (2d) 560, 562 (1994) ("[a]n individual is 'seized' when an officer restrains his freedom, even if the detention is brief and falls short of an arrest."). That is, "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry*, 392 U.S. at 19 n. 16, 88 S.Ct. 1979 n. 16.

In determining whether an encounter between a law enforcement official and a citizen constitutes a seizure, and thereby implicates Fourth Amendment protection, the correct inquiry is whether, considering all of the circumstances surrounding the encounter, a reasonable person would have believed he was not free to leave. *Mendenhall*, 446 U.S. at 545, 100 S.Ct. at 1872-73. So long as the person approached and questioned remains free to disregard the officer's questions and walk away, no intrusion upon the person's liberty or privacy has taken place and, therefore, no constitutional justification for the encounter is necessary. *Id.* at 554, 100 S.Ct. at 1877; *see also State v. Foster*, 269 S.C. 373, 237 S.E. (2d) 589 (1977) (person has not been seized where he is neither detained nor frisked and remains free to refuse to cooperate with enforcement officers).

We hold the trial court erred in failing to find the North Charleston police officer's encounter with Rodriquez amounted to a "seizure" within the meaning of the Fourth Amendment. As noted by the trial court, Rodriquez was repeated advised he was free to leave at any time during the police questioning, but the officers placed a "qualification" on this freedom. In our view, a reasonable person would not have believed he was free to walk away from two police detectives who informed him that all he needed to do was cooperate with their request to search his belongings and, if nothing incriminating was discovered, he would then be "clear to go."

We think that by placing a condition upon Rodriquez's freedom to simply walk away from the encounter, the officers effectuated a seizure of his person within the meaning of the Fourth Amendment. *See Mendenhall,* 446 U.S. at 554, 100 S.Ct. at 1877 ("Examples of circumstances that might indicate a seizure, *even where the person did not attempt to leave,* would be the threatening presence of several officers . . . or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.") (Emphasis added); *see also United States v. Wilson,* 953 F. (2d) 116 (4th Cir. 1991) (holding defendant was seized for Fourth Amendment purposes when, after permitting a search of his person and bags but refusing to allow a search of his coat, he attempted to walk away from police officers who followed and continued to question him).

### B. Reasonableness of Seizure

Having determined Rodriquez was in fact seized during his encounter with Detectives Denney and Roberts, we must determine whether his Fourth Amendment rights were thereby violated.

Clearly, "what the Constitution forbids is not all search and seizures, but unreasonable searches and seizures." *Elkins v. United States,* 364 U.S. 206, 222, 80 S.Ct. 1437, 1446, 4 L.Ed. (2d) 1669 (1960). It is well established that the police may stop and briefly detain and question a person, without treading upon his Fourth Amendment rights, upon a reasonable suspicion supported by articulable facts, short of probable cause for arrest, that the person is involved in criminal activity. *State v. Foster,* 269 S.C. 373, 379, 237 S.E. (2d) 589, 591 (1977) (citing *Terry,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed. (2d) 889 (1968)); *see also United States v. Place,* 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed. (2d) 110 (1983); *State v. Morris,* 312 S.C. 116, 439 S.E. (2d) 291 (Ct. App. 1993). Here, because Rodriquez does not challenge the State's position the officers had an articulable suspicion he was involved in criminal activity, we need not address this prong of the required constitutional analysis. However, even assuming the validity of the initial seizure of Rodriquez's person, we conclude the seizure exceeded reasonableness limitations prescribed in *Terry* and its progeny.

The reasonableness of an "on-the-scene" warrantless seizure depends on the balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers. *Foster,* 269 S.C. at 381, 237 S.E. (2d) at 592 (citing *United States v. Brignoni-Ponce,* 422 U.S. 873, 878, 95 S.Ct. 2574, 2578-79, 45 L.Ed. (2d) 607 (1975). The applicable balancing test employees judicial review of all of the circumstances including but not limited to: (1) the seriousness of the offense; (2) the degree of likelihood that the person detained may have witnessed or been involved in the offense; (3) the proximity in time and space from the scene of the crime; (4) the urgency of the occasion; (5) the nature of the detention and its extent; (6) the means and procedures employed by the officer; and (7) the presence of any circumstances suggesting harassment or a deliberate effort to avoid the necessity of securing a warrant. *United States v. Holland,* 510 F. (2d) 453, 455-56 (9th Cir. 1975). Given the intrusive nature of a seizure, and considering the fact that on occasion a person may be wrongfully stopped, the United States Supreme Court has held, as has the Supreme Court of this State, that the scope and duration of a *Terry* detention must be strictly tied to and justified by the circumstances which rendered its initiation proper. *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed. (2d) 229 (1983); *Sikes v. State,* 448 S.E. (2d) 560 (1994). The burden falls upon the State to "demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." *Royer,* 460 U.S. at 500, 103 S.Ct. at 1326.

Here, two experienced officers were informed on March 23, 1993 that a man named Rodriquez who (1) made frequent train trips to New York; (2) often returned relatively soon after departing; and (3) was regularly picked up by the same person, would be returning to Charleston from New York on March 24. These officers were also aware another man using the name Rodriquez had been arrested for drug trafficking several months earlier and had indicated there might be another drug courier who used the same name. Based on this information, the officers suspected Rodriquez might be carrying drugs when he arrived back in Charleston on March 24. Nevertheless, the officers did not arrange to have a canine drug

detection unit at the station when Rodriquez arrived, even after they learned the train on which he was traveling was significantly behind schedule. *See United States v. Sharpe,* 470 U.S. 675, 686, 105 S.Ct. 1568, 1575, 84 L.Ed. (2d) 605 (1985) ("[i]n assessing whether a detention is too long in duration to be justified as an investigative stop, [it is] appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant."). Even assuming an investigative detention was proper at that point, we find a thirty-minute detention while the officers attempted to elicit incriminating evidence from Rodriquez is the type of fishing expedition denounced by our Supreme Court in *Sikes,* 448 S.E. (2d) at 563 (assuming arguendo, that stop of motor vehicle passengers was reasonable, twenty-minute detention while officers "went fishing" for some evidence of crime was not brief). In light of the foregoing, we hold the intrusion of the officers in this case was not reasonable. The fact that the actions of other officers, who arrived at the scene after Detectives Denney and Roberts had illegally detained Rodriquez, fortuitously produced evidence of an illegal pistol and other contraband does not vitiate the fact Rodriquez's Fourth Amendment rights were violated.

The detention and arrest of Rodriquez was constitutionally violative; therefore, the evidence of his possession of a pistol and various quantities of narcotics and drug paraphernalia should have been deemed inadmissible as fruit of the poisonous tree. *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed. (2d) 441 (1963); *Sikes,* 448 S.E. (2d) 560.

Accordingly, the decision of the trial court is REVERSED.

GOOLSBY and CONNOR, JJ., concur.