525 S.E.2d 535

**The STATE, Respondent,**

v.

**Algin BLASSINGAME, Appellant.**

**No. 3085.**

Court of Appeals of South Carolina.

Heard Nov. 2, 1999.

Decided Dec. 6, 1999.

242

Assistant Appellate Defender Melissa J. Reed Kimbrough, of South Carolina Office of Appellate Defense, of Columbia, for appellant.

Attorney General Charles M. Condon, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Salley W. Elliott and Senior Assistant Attorney General Harold M. Coombs, Jr., all of Columbia; and Solicitor Robert M. Ariail, of Greenville, for respondent.

ANDERSON, Judge:

Algin Blassingame was convicted of kidnapping, carjacking, and armed robbery. He was sentenced, respectively, to thirty years, fifteen years concurrent, and ten years consecutive. On appeal, Blassingame argues the trial court erred in admitting into evidence a knife and the victim's pre-trial identification of him. We affirm.

### FACTS/PROCEDURAL BACKGROUND

John Scarborough and employees of his janitorial business were cleaning buildings on the night of June 3, 1997. As Scarborough drove from one job site to another late that evening, a man jumped in the passenger side of his truck at a traffic light. The man pulled out a distinctive utility knife, held it to Scarborough's face, and ordered him to drive. Scarborough drove down a series of roads as directed, eventually pulling into an alley. Holding the knife under Scarborough's nose, the man told Scarborough, "Okay, I want everything you've got." Scarborough began emptying his pockets. The man pressed the knife so hard against Scarborough's skin

at this time that it cut him. When the man saw Scarborough's ATM card, he announced: "We're going to the bank." The man demanded Scarborough's wedding ring and ordered him to take off his pants and shoes. After checking to make sure the pockets were empty, the man threw the clothes out the window.

Scarborough began driving again, as demanded. During the drive, the man repeatedly told Scarborough to drive faster and that if he did not have at least $200 in the bank the man would kill him. When Scarborough said he had no money in the account, the man struck him in the head three or four times. When they arrived at the ATM, the man told Scarborough if he had less than $200 in the bank the man would sexually mutilate him before cutting his throat and leaving him to die. Scarborough again told the man he had no money in the account. The man responded by moving the knife away from Scarborough's face, grabbing his arm and declaring, "I'm going to f * *k you." With the knife away from his face, Scarborough opened the door, jumped out of the truck, and ran. Scarborough ran approximately 150 yards to a pay phone and dialed 911. While on the phone with the dispatcher, Scarborough watched the man drive away in his truck.

When the police arrived, Scarborough provided a description of his truck, the perpetrator, and the knife. He described the perpetrator as a stocky black man approximately his own height, weighing about 210 pounds, with a beard and mustache. The man was wearing blue jeans, a white t-shirt, a baseball cap, and a windbreaker. The knife he had used was a fluorescent yellow utility knife with a retractable blade. The blade was scored so that a used, dull tip could be broken away to reveal a new, sharp tip. This information was radioed to dispatch which issued a "be on the lookout" alert. Shortly thereafter, an officer spotted a black man driving at a high rate of speed in a truck which appeared to be Scarborough's. Initially, the officer lost sight of the vehicle but found it, parked and abandoned, less than one minute later. The officer positively identified the vehicle by "running the tag."

Shortly after the victim's vehicle was discovered, Officer Roy Lee Godwin arrived and began searching the area on foot,

looking for a suspect. In a nearby alley, Godwin encountered Blassingame walking in the opposite direction. As he and Blassingame approached one another, Godwin noticed Blassingame was a black male, approximately five feet ten inches tall, weighing about 210–220 pounds, with a beard and a mustache. He also noticed Blassingame was wearing a white t-shirt and blue jeans. The officer stopped walking and began a conversation with Blassingame. He told Blassingame police were in the area looking for a carjacking suspect. While he was talking to Blassingame, Godwin began mentally comparing the description of the carjacker to Blassingame's appearance. Noticing how well Blassingame fit the description, the officer decided to ask the man some questions about himself. When asked, Blassingame told Godwin he was coming from his sister's apartment, but he could not provide an address. This raised Officer Godwin's suspicion. He decided to pat Blassingame down because of his questionable story, his size, and because he matched the description of the "armed and dangerous suspect." Officer Godwin stated: "I advised [Blassingame] that we were looking for a carjacker who I knew was armed and dangerous and I told him I was going to pat him down for my safety and protection." Inside Blassingame's right front pocket, the officer found a fluorescent yellow utility knife matching the description of the carjacker's weapon.

After finding the knife, Officer Godwin handcuffed Blassingame and took him to the scene where the truck was found so he could be identified or ruled out as a suspect. When an officer arrived at the scene with Scarborough, Blassingame was in the back seat of a patrol car. Scarborough first identified Blassingame while the car he was arriving in was in motion and while Blassingame was in the patrol car. When Scarborough got out of the car, he identified Blassingame immediately, "with vigor and without hesitation."

Scarborough made a list of things missing from his truck, including approximately twenty dollars, his checkbook, a cellular phone, and the vacuum cleaner he used in his business. Although police found none of Scarborough's belongings on Blassingame's person, a vacuum cleaner matching the description of Scarborough's vacuum was discovered the next day on the premises of Blassingame's home.

## *ISSUES*

I. Did the trial court err in admitting the knife into evidence?

II. Did the trial court err in admitting the pre-trial identification into evidence?

## *LAW/ANALYSIS*

### I. Motion to Suppress Knife

 Blassingame argues the trial court erred in "denying defense counsel's motion to suppress evidence obtained after [Blassingame] was unlawfully stopped and frisked in violation of his rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution." We disagree.

At trial, Blassingame moved to suppress the knife Officer Godwin found on his person as poisonous fruit of an improper stop and frisk. The trial court ruled the knife admissible, concluding Officer Godwin "had a reasonable suspicion that the defendant was involved in criminal activity." Upon review, we conclude the knife was properly admitted.

The United States Supreme Court recently addressed the standard of review in cases involving questions of an officer's reasonable suspicion to make a stop or probable cause to conduct a warrantless search. After conducting a review of prior case law, the Court, in *Ornelas v. United States*, 517 U.S. 690, 699, 116 S.Ct. 1657, 1663, 134 L.Ed.2d 911, 920 (1996), held "determinations of reasonable suspicion and probable cause should be reviewed *de novo* on appeal." The *Ornelas* Court elucidated the analysis to be applied: "Having said this, we hasten to point out that a reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." *Ornelas*, 517 U.S. at 699, 116 S.Ct. at 1663, 134 L.Ed.2d at 920.

In *State v. Rodriquez*, 323 S.C. 484, 476 S.E.2d 161 (Ct.App. 1996),[1] this Court, citing *Ornelas*, noted appellate courts

---

1. Certiorari was granted on July 23, 1997, but was later dismissed as improvidently granted. *See State v. Rodriquez*, 333 S.C. 61, 508 S.E.2d 29 (1998).

should conduct *de novo* reviews of trial court determinations of reasonable suspicion to make stops and probable cause to conduct warrantless searches. *See also State v. Smith,* 329 S.C. 550 n. 2, 495 S.E.2d 798 n. 2 (Ct.App.1998), *cert. granted,* (Oct. 9, 1998), and *cert. dismissed,* 335 S.C. 550, 518 S.E.2d 821 (1999) (citing the *Ornelas* standard of review, but applying both the *Ornelas* standard and the traditional standard of review; noting our Supreme Court's grant of certiorari in *Rodriquez*); *State v. Brockman,* 329 S.C. 115, 494 S.E.2d 440 (Ct.App.1997), *cert. granted,* (Dec. 3, 1998) (applying the *Ornelas* standard of review). We adopt and apply the *Ornelas* standard as we conduct our *de novo* review of the trial court's determinations of reasonable suspicion to make the stop and probable cause to conduct the warrantless search.

▮▮▮ A police officer may stop and briefly detain and question a person for investigative purposes, without treading upon his Fourth Amendment rights, when the officer has a reasonable suspicion supported by articulable facts, short of probable cause for arrest, that the person is involved in criminal activity. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *State v. Robinson,* 306 S.C. 399, 412 S.E.2d 411 (1991); *State v. Foster,* 269 S.C. 373, 237 S.E.2d 589 (1977); *State v. Fowler,* 322 S.C. 263, 471 S.E.2d 706 (Ct.App.1996). The term "reasonable suspicion" requires a particularized and objective basis that would lead one to suspect another of criminal activity. *United States v. Cortez,* 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981); *State v. Lesley,* 326 S.C. 641, 486 S.E.2d 276 (Ct.App.1997). In determining whether reasonable suspicion exists, the whole picture must be considered. *United States v. Sokolow,* 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989); *Lesley, supra.*

▮▮▮ "If the officer's suspicions are confirmed or are further aroused, the stop may be prolonged and the scope enlarged as required by the circumstances." *State v. Culbreath,* 300 S.C. 232, 236, 387 S.E.2d 255, 257 (1990), *abrogated on other grounds by Horton v. California,* 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990). Even where the stop is deemed proper, "before the police may frisk a defendant, they must have a reasonable belief the defendant is armed and dangerous." *Fowler,* 322 S.C. at 267, 471 S.E.2d at 708. In

assessing whether a suspect is armed and dangerous, the officer need not be absolutely certain the individual is armed. *Terry, supra; State v. Smith,* 329 S.C. 550, 495 S.E.2d 798 (Ct.App.1998). The issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. *Terry, supra; Smith, supra.*

When Officer Godwin began his conversation with Blassingame, he wanted to know if Blassingame had seen anybody running or if he saw anybody in the area fitting the description of the suspect. At this point, the officer thought "maybe he could help me ... find this guy."

■ We conclude Officer Godwin did not "stop" Blassingame for *Terry* purposes until after he conversed with him about the carjacking and decided Blassingame closely fit the description of the suspect. Not all personal encounters between police officers and citizens implicate the Fourth Amendment. *Culbreath, supra.* "So long as the person approached and questioned remains free to disregard the officer's questions and walk away, no intrusion upon the person's liberty or privacy has taken place and, therefore, no constitutional justification for the encounter is necessary." *State v. Rodriquez,* 323 S.C. 484, 491, 476 S.E.2d 161, 165 (Ct.App.1996). The "stop" occurred when Blassingame was asked to answer questions regarding the place from which he was walking. Officer Godwin, realizing Blassingame fit the suspect's description, briefly detained him for investigative purposes, asking only a few simple questions. We find the officer had reasonable suspicion to stop Blassingame based on his presence near the abandoned truck and his appearance, which closely matched that of the suspect.

■ When Blassingame could not explain where he had been, the officer, aware that Blassingame was a sizeable man who fit the description of the armed and dangerous carjacking suspect, frisked him for safety reasons. A reasonably prudent man in these circumstances, faced with a man who met the description of an armed carjacker, kidnapper, and robber who could not satisfactorily explain why he was in the area, would be warranted in a belief that his safety was in danger. We

hold the stop and frisk was proper. Thus, the distinctive knife seized as a result of the patdown was properly admitted.

## II. Identification

At trial, Blassingame sought suppression of Scarborough's out of court identification of him. On appeal, he argues the identification should have been suppressed on the ground that it is poisonous fruit of an illegal stop, frisk, and arrest. Additionally, he claims the identification procedure employed was impermissibly suggestive. We find no error.

### A. Probable Cause

■ Having determined Officer Godwin possessed reasonable suspicion to stop Blassingame, and that he had a reasonable belief that, for safety reasons, a frisk was necessary, we need only determine whether the officer had probable cause to arrest Blassingame.

■ The fundamental question in determining the lawfulness of an arrest is whether probable cause existed to make the arrest. *Wortman v. City of Spartanburg,* 310 S.C. 1, 425 S.E.2d 18 (1992). "Probable cause is defined as a good faith belief that a person is guilty of a crime when this belief rests on such grounds as would induce an ordinarily prudent and cautious person, under the circumstances, to believe likewise." *Id.* at 4, 425 S.E.2d at 20. Probable cause may be found somewhere between suspicion and sufficient evidence to convict. *Thompson v. Smith,* 289 S.C. 334, 336–37, 345 S.E.2d 500, 502 (Ct.App.1986), *overruled in part on other grounds by Jones v. City of Columbia,* 301 S.C. 62, 389 S.E.2d 662 (1990). In determining the presence of probable cause for arrest, the probability cannot be technical, but must be factual and practical considerations of everyday life on which reasonable, prudent and cautious men, not legal technicians, act. *Gist v. Berkeley County Sheriff's Dep't,* 336 S.C. 611, 521 S.E.2d 163 (Ct.App.1999).

After Officer Godwin frisked Blassingame ·and found a fluorescent yellow utility knife with a retractable blade featuring break away tips which matched the victim's description of the suspect's weapon, Officer Godwin handcuffed Blassingame and took him for identification. At this point, Blassingame

was clearly under arrest. Despite Blassingame's argument to the contrary, we find the officer possessed probable cause to arrest at that time. Blassingame was walking in the neighborhood where the victim's truck had been found, he could not account for his presence in the neighborhood, he met the physical description of the suspect provided by the victim, and he possessed a distinctive knife, which matched the victim's description of the suspect's weapon. Based upon factual and practical considerations of everyday life, the officer had probable cause.

## B. Show-up

 The admission of the victim's out of court identification of Blassingame is not barred by the Fourth Amendment. Therefore, we consider whether the identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.

 Questions regarding the admissibility of evidence are left to the trial court's sound discretion. *State v. Patterson*, 337 S.C. 215, 522 S.E.2d 845 (Ct.App.1999). Accordingly, evidentiary rulings of the trial court will not be set aside on appeal absent an abuse of discretion or the commission of legal error which results in prejudice to the defendant. *Id.*

 A criminal defendant may be deprived of due process of law by an identification procedure that is unnecessarily suggestive and conducive to irreparable mistaken identification. *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); *Patterson, supra.* Single person show-ups are disfavored because they are suggestive by their nature. *See State v. Moore*, 334 S.C. 411, 513 S.E.2d 626 (Ct.App.1999). It is well established, however, that an identification may be reliable under the totality of the circumstances even when the procedure has been suggestive. *See Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *State v. Gambrell*, 274 S.C. 587, 266 S.E.2d 78 (1980); *Moore, supra.* Suggestiveness alone does not mandate the exclusion of evidence. *Patterson, supra.* Reliability is the linchpin in determining the admissibility of identification testimony. *Manson v. Brathwaite*, 432 U.S. 98, 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977).

To determine whether an identification is reliable, it is necessary to consider the factors set forth in *Neil v. Biggers:* 1) the opportunity of the witness to view the criminal at the time of the crime; 2) the witness's degree of attention; 3) the accuracy of the witness's prior description of the criminal; 4) the level of certainty demonstrated by the witness at the confrontation; and 5) the amount of time between the crime and the confrontation. *See Neil, supra; State v. Stewart,* 275 S.C. 447, 272 S.E.2d 628 (1980). The corrupting effect of a suggestive identification is to be weighed against these factors. *Patterson, supra.* After the trial court determines the witness's identification is reliable, the witness is permitted to testify before the jury. *Moore, supra.*

Notwithstanding the suggestive nature of the show-up, the identification of Blassingame was reliable in light of the totality of the circumstances. First, the record reflects Scarborough had several opportunities to view the man who kidnapped, robbed, and carjacked him at knife-point. When the man got into his truck at a traffic light, the interior light turned on automatically and Scarborough looked directly at the man. When Scarborough stopped the truck in an alley and began turning over his possessions to the man, he turned on the vehicle's interior light and had an additional opportunity to look at the man as the man went through his wallet. Furthermore, Scarborough had a chance to see the man plainly in the bank parking lot, which had its own lighting, when he stopped at the ATM for three to four minutes. Scarborough paid particularly close attention to Blassingame because he was threatening to kill Scarborough. A person in fear of his life presumably has a more acute degree of attention to his surroundings than a mere passerby. *See State v. Ford,* 278 S.C. 384, 296 S.E.2d 866 (1982); *State v. Patterson,* 337 S.C. 215, 522 S.E.2d 845 (Ct.App.1999).

Second, although Scarborough was forced to drive during much of the incident, he was able to give the police a detailed and accurate description of the man. Third, when brought to the scene, Scarborough immediately and vigorously identified Blassingame, by stating " 'There's the guy that did this to me,' " before the police asked Scarborough if he recognized the man. Scarborough expressed absolute certainty that Blassingame was the perpetrator. Finally, the identification

took place approximately one and one-half hours after the incident.

The pre-trial identification satisfies the criteria of *State v. Stewart, supra,* and *Neil v. Biggers, supra.* The trial court did not err in failing to grant Blassingame's motion to suppress Scarborough's pre-trial identification of him.

## CONCLUSION

We hold the officer had a reasonable suspicion supported by articulable facts to stop Blassingame. Because the officer was warranted in his belief his safety was in danger, the frisk was lawful. Thus, the court did not err in admitting the knife seized as a result of the patdown. The trial court properly denied Blassingame's motion to suppress Scarborough's pre-trial identification of him under a due process analysis. Accordingly, Blassingame's convictions for kidnapping, carjacking, and armed robbery are

**AFFIRMED.**

CONNOR and STILWELL, JJ., concur.