802 S.E.2d 803

**The STATE, Respondent,**

**v.**

**Eric Terrell SPEARS, Appellant.**

**Appellate Case No. 2015-000390**
**Opinion No. 5489**

Court of Appeals of South Carolina.

Heard February 13, 2017
Filed May 31, 2017
Rehearing Denied August 18, 2017

364

Appellate Defender LaNelle Cantey DuRant, of Columbia, for Appellant.

Attorney General Alan McCrory Wilson, Assistant Deputy Attorney General David A. Spencer, and Solicitor Daniel Edward Johnson, all of Columbia, for Respondent.

KONDUROS, J.:

Eric Terrell Spears appeals his conviction and sentence for trafficking crack cocaine between ten and twenty-eight grams. He argues the trial court erred by denying his motion to suppress drug evidence because he was seized within the

meaning of the Fourth Amendment and law enforcement lacked a reasonable suspicion he was involved in criminal activity. We reverse.

## FACTS/PROCEDURAL BACKGROUND

On March 29, 2012, agents of the Drug Enforcement Agency (DEA) working with the Lexington County Sheriff's Office received a tip that one or two black males being investigated by the DEA were traveling from New York City to South Carolina on the "Chinese bus lines." These bus lines depart from Chinatown and are owned and operated by Chinese Americans and Chinese Canadians. According to the DEA agents, the buses are often patronized by wanted subjects and people trafficking in narcotics and counterfeit goods because the bus lines are inexpensive, do not require identification, and have no security measures. On that day, two of these buses were scheduled to arrive at different locations in Richland County. Agents Dennis Tracy, Briton Lorenzen, and Frank Finch were dispatched to one of the bus stops. They were dressed in plain clothes, and Lorenzen's and Finch's badges and guns were visible. The agents arrived at the bus stop as passengers were exiting the bus.

Amongst the passengers disembarking, the agents observed Spears and Traci Williams, a female, exit the bus and retrieve four large bags. Unlike the other passengers, Spears and Williams appeared nervous and kept looking at the agents and talking amongst themselves. Spears and Williams left the bus stop on foot, and the agents followed them. As they walked, Spears and Williams continued to look back at the agents, and Williams appeared to hand something to Spears. After following Spears and Williams for several hundred feet, the agents walked at a fast pace to catch up with them. The agents identified themselves and asked to speak with Spears and Williams. Solely based on Williams and Spears's activity, not the tip, the agents made contact with Spears and Williams to identify them and ascertain whether they were involved in criminal activity. The agents asked to speak with Spears and Williams and asked them questions such as where they had traveled from and where they were going. Agent Tracy then told Spears and Williams there had been problems in the past with wanted subjects, drugs, and counterfeit merchandise on the bus line and asked them for their identification. After

Spears gave Agent Tracy his identification, Agent Tracy asked Spears if he had any illegal weapons or items on him or in his property. Spears hesitated before saying "no," making Agent Tracy suspicious because until that point, Spears had been very forthcoming.

Around the time Agent Tracy asked Spears about illegal items, Spears began to put his hands underneath his shirt and make what Agent Tracy described as a "puffing" motion, pushing the shirt away from his waistband and body. Agent Tracy asked Spears not to do this because he needed to see Spears's hands for safety purposes. Spears stopped momentarily but then repeated the motion. After asking Spears not to do this three times, Agent Tracy told Spears he was going to search him for weapons. While patting Spears down, Agent Tracy felt a rocky, ball-like object that felt consistent with crack cocaine. After completing the search, Agent Tracy removed the object from Spears's waistband. The object was wrapped in a napkin and inside a plastic bag. Agent Tracy removed the object from the plastic bag and the napkin, saw it was consistent with crack cocaine, and arrested Spears.

Prior to trial, Spears moved to suppress the drug evidence, arguing he was seized by the agents because a reasonable person would not have felt free to leave and the agents did not have reasonable suspicion to stop Spears and Williams.[1] The State contended the encounter between Spears, Williams, and the agents was consensual and therefore, the agents did not need reasonable suspicion.

The trial court denied Spears's motion to suppress the drugs. The trial court concluded the agents engaged Spears in a consensual encounter, finding Spears and Williams willingly stopped and talked with the agents, the agents told Spears and Williams they were law enforcement, and the agents did not tell Spears he was not free to leave.[2] At trial, Spears was

---

1. Spears also argued the agents did not have reasonable suspicion he was armed, the plain-feel doctrine did not apply, and Agent Tracy exceeded the scope of the frisk. On appeal, Spears only challenges the search.

2. During the hearing on Spears's motion to suppress, the trial court heard arguments on whether Spears was seized or engaged by the agents in a consensual encounter. The trial court asked, "[W]hat's the

convicted of trafficking cocaine between ten and twenty-eight grams and received a thirty-year sentence.

## STANDARD OF REVIEW

■ "On appeals from a motion to suppress based on Fourth Amendment grounds, this [c]ourt applies a deferential standard of review and will reverse if there is clear error." *State v. Adams*, 409 S.C. 641, 647, 763 S.E.2d 341, 344 (2014) (quoting *State v. Tindall*, 388 S.C. 518, 521, 698 S.E.2d 203, 205 (2010)). "The 'clear error' standard means that an appellate court will not reverse a trial court's finding of fact simply because it would have decided the case differently." *State v. Pichardo*, 367 S.C. 84, 96, 623 S.E.2d 840, 846 (Ct. App. 2005). "Rather, appellate courts must affirm if there is any evidence to support the trial court's ruling." *State v. Moore*, 415 S.C. 245, 251, 781 S.E.2d 897, 900 (2016), *cert. denied*, — U.S. —, 136 S.Ct. 2473, 195 L.Ed.2d 809 (2016).

## LAW/ANALYSIS

### I. Seizure

Spears argues the trial court erred by denying his motion to suppress because he was seized under the Fourth Amendment. We agree.

■ "The Fourth Amendment prohibits unreasonable searches and seizures." *State v. Anderson*, 415 S.C. 441, 447, 783 S.E.2d 51, 54 (2016) (citing U.S. Const. amend. IV). "The security and protection of persons and property provided by

---

evidence that criminal activity is afoot? [F]or a Terry stop one issue is [an] officer's safety, but the other issue is the officer has to believe that criminal activity is afoot." When denying Spears's motion to suppress, the trial court did not explicitly rule the agents engaged Spears in a consensual encounter, finding only that the agents "pointed to specific and articulable facts [that] warranted a search of [Spears]'s person." However, when listing the facts it found warranted the search, the trial court stated the agents "initiated a conversation with [Spears] and [he] and [Williams] willingly stopped and spoke with law enforcement. The agents notified [Spears] that they were law enforcement. [The agents] never told [Spears] he was not free to leave." Thus, based on the record, we conclude the trial court implicitly ruled this was a consensual encounter. *See State v. McLaughlin*, 307 S.C. 19, 23, 413 S.E.2d 819, 821 (1992) (finding the record supported the trial court's implicit ruling that appellant's rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), were voluntarily waived).

the Fourth Amendment are fundamental values." *State v. Gamble*, 405 S.C. 409, 420, 747 S.E.2d 784, 789 (2013). "A person has been seized within the meaning of the Fourth Amendment at the point in time when, in light of all the circumstances surrounding an incident, a reasonable person would have believed that he was not free to leave." *Robinson v. State*, 407 S.C. 169, 181, 754 S.E.2d 862, 868 (2014) (citing *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980)); *see also United States v. Sullivan*, 138 F.3d 126, 132 (4th Cir. 1998) ("The test ... [to] determin[e] whether a person has been seized for purposes of the Fourth Amendment is whether, under the totality of the circumstances surrounding the encounter, a reasonable person in the suspect's position 'would have felt free to decline the officers' requests or otherwise terminate the encounter.'" (quoting *Florida v. Bostick*, 501 U.S. 429, 438, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991))).

■ "[T]he nature of the reasonableness inquiry is highly fact-specific." *State v. Brannon*, 379 S.C. 487, 499, 666 S.E.2d 272, 278 (Ct. App. 2008).

Although no single factor dictates whether a seizure has occurred, courts have identified certain probative factors, including the time and place of the encounter, the number of officers present and whether they were uniformed, the length of the detention, whether the officer moved the person to a different location or isolated him from others, whether the officer informed the person he was free to leave, whether the officer indicated to the person that he was suspected of a crime, and whether the officer retained the person's documents or exhibited threatening behavior or physical contact.

*State v. Williams*, 351 S.C. 591, 600, 571 S.E.2d 703, 708 (Ct. App. 2002). "Not all personal encounters between police officers and citizens implicate the Fourth Amendment." *State v. Blassingame*, 338 S.C. 240, 249, 525 S.E.2d 535, 540 (Ct. App. 1999). "So long as the person approached and questioned remains free to disregard the officer's questions and walk away, no intrusion upon the person's liberty or privacy has taken place and, therefore, no constitutional justification for

the encounter is necessary." *State v. Rodriquez*, 323 S.C. 484, 491, 476 S.E.2d 161, 165 (Ct. App. 1996).

■ "Our first task is to establish at what point in this encounter the Fourth Amendment becomes relevant. That is, we must decide whether and when [the agents] 'seized'" Spears. *Terry v. Ohio*, 392 U.S. 1, 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Here, the trial court identified the following factors as evidence Spears and the agents were engaged in a consensual encounter: Spears and Williams willingly stopped and talked with the agents, the agents told Spears and Williams they were law enforcement, and the agents did not tell Spears he was not free to leave. But, this is not the totality of the circumstances. Several of the factors identified in *Williams* as probative of whether a seizure has occurred are present in this case: Spears and Williams were approached by three agents, two of whom had their guns visible; the agents waited to engage Spears and Williams until they were alone; the agents did not inform Spears and Williams they were free to leave; Agent Tracy indicated Spears was suspected of a crime by following Spears, telling him the bus lines were known for illegal activity, and asking him if he had any illegal weapons or items on his person or in his property; and the agents exhibited threatening behavior by following Spears and Williams for several hundred feet before the agents increased their pace to catch up with Spears and Williams.

All but one of the *Williams* factors present in this case were manifest at the time the agents increased their speed to make contact with Spears and request to question him. However, the final *Williams* factor occurred when Agent Tracy asked Spears if he possessed any illegal weapons or items on him or in his property. Although Spears was arguably seized the moment the agents made contact with him, at the latest, Spears was seized when Agent Tracy asked Spears if he had any illegal weapons or items on him or in his property. *See Blassingame*, 338 S.C. at 249, 525 S.E.2d at 540 (finding a stop occurred for *Terry* purposes when the officer questioned appellant about a carjacking in the area and the place from which appellant was walking).

The fact the agents increased their speed to catch up with Spears and Williams after following them for several hundred

feet is particularly significant. A consensual encounter between a law enforcement officer and a person is predicated on the person being able to "disregard the officer's questions and *walk away.*" *Rodriquez*, 323 S.C. at 491, 476 S.E.2d at 165 (emphasis added). Before the agents made contact with Spears, he had walked several hundred feet without the agents engaging him, indicating he was free to continue walking. By increasing their speed to catch up with Spears, the agents indicated to Spears he was no longer free to continue walking away. This is especially true considering that when the agents stopped Spears, they asked for his identification and whether he was engaged in illegal activity. Thus, in light of all the circumstances surrounding this incident, we conclude a reasonable person in Spears's position would not have felt free to walk away, and Spears was seized within the meaning of the Fourth Amendment.

## II. Reasonable Suspicion

Spears argues the agents lacked reasonable suspicion to stop him. We agree.[3] Because Spears was seized within the

---

3. The trial court did not determine whether the agents had reasonable suspicion to stop Spears because it concluded Spears and the agents were involved in a consensual encounter. "Given our standard of review, the normal procedural course would be to remand this case to the [trial] court" to determine whether the agents had reasonable suspicion to stop Spears. *State v. Hewins*, 409 S.C. 93, 113, 760 S.E.2d 814, 824 (2014) (citing *State v. Tindall*, 388 S.C. 518, 521, 698 S.E.2d 203, 205 (2010) ("On appeals from a motion to suppress based on Fourth Amendment grounds, this [c]ourt applies a deferential standard of review and will reverse if there is clear error. However, this deference does not bar this [c]ourt from conducting its own review of the record to determine whether the trial [court]'s decision is supported by the evidence." (citation omitted)). However, like in *Hewins*, in the interest of judicial economy, we have decided to address the merits of this issue as the parties fully argued it during the suppression hearing, in their briefs, and at oral argument. *See Hewins*, 409 S.C. at 113, 760 S.E.2d at 824 (addressing the merits of Hewins's motion to suppress in the interest of judicial economy instead of remanding to the circuit court for a hearing); *see also State v. Moore*, 343 S.C. 282, 288, 540 S.E.2d 445, 448 (2000) ("Given our finding that the show-up used in this case was unduly suggestive, we must determine whether a remand is necessary or whether, under the unique facts of this case, the matter of reliability may be determined by this Court. We find a remand unnecessary.... [U]nder the facts of this case, the identification is

meaning of the Fourth Amendment, we must determine whether the agents had reasonable suspicion, or "an objective, specific basis for suspecting [Spears] of criminal activity." *Robinson*, 407 S.C. at 182, 754 S.E.2d at 868-69 (citing *United States v. Cortez*, 449 U.S. 411, 417-18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)).

 "Pursuant to *Terry*, a police officer with a reasonable suspicion based on articulable facts that a person is involved in criminal activity may stop, briefly detain, and question that person for investigative purposes, without treading upon his Fourth Amendment rights." *Anderson*, 415 S.C. at 447, 783 S.E.2d at 54. "[L]ooking at the totality of the circumstances, reasonable suspicion requires there be an objective, specific basis for suspecting the person stopped of criminal activity." *Robinson*, 407 S.C. at 182, 754 S.E.2d at 868.

 "Reasonable suspicion 'is not readily, or even usefully, reduced to a neat set of legal rules, but, rather, entails common sense, nontechnical conceptions that deal with factual and practical considerations of everyday life on which reasonable and prudent persons, not legal technicians, act.' " *State v. Provet*, 391 S.C. 494, 500, 706 S.E.2d 513, 516 (Ct. App. 2011) (quoting *United States v. Foreman*, 369 F.3d 776, 781 (4th Cir. 2004)). "Reasonable suspicion is more than a general hunch but less than what is required for probable cause." *State v. Willard*, 374 S.C. 129, 134, 647 S.E.2d 252, 255 (Ct. App. 2007); *see also Robinson*, 407 S.C. at 182, 754 S.E.2d at 868 ("Reasonable suspicion is something more than an 'inchoate and unparticularized suspicion' or hunch." (quoting *Terry*, 392 U.S. at 27, 88 S.Ct. 1868)). It is "a particularized and objective basis for suspecting legal wrongdoing." *Anderson*, 415 S.C. at 447, 783 S.E.2d at 54 (quoting *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002)). "Reasonableness is measured in objective terms by examining the totality of the circumstances. As a result, the nature of the reasonableness inquiry is highly fact-specific." *State v. Pichardo*, 367 S.C. 84, 101, 623 S.E.2d 840, 849 (Ct. App. 2005).

---

unreliable as a matter of law and therefore a remand would serve no useful purpose.").

"Although never dispositive ... being in a high crime area can be a consideration in our analysis of the totality of the circumstances." *Anderson*, 415 S.C. at 447, 783 S.E.2d at 55. Moreover, "[w]hile nervous behavior is a pertinent factor in determining reasonable suspicion ... the single element of nervousness [should not be parlayed by law enforcement] into a myriad of factors supporting reasonable suspicion." *Moore*, 415 S.C. at 254-55, 781 S.E.2d at 902 (footnote omitted). "The police officer may make reasonable inferences regarding the criminality of a situation in light of his experience, but he must be able to point to articulable facts that, in conjunction with his inferences, 'reasonably warrant' the intrusion." *Robinson*, 407 S.C. at 182, 754 S.E.2d at 869 (quoting *Terry*, 392 U.S. at 21, 27, 88 S.Ct. 1868).

Our supreme court's recent consideration of reasonable suspicion during a street encounter in *Anderson* is instructive. In *Anderson*, officers were executing a search warrant at a home where they had observed drug activity. 415 S.C. at 444, 783 S.E.2d at 53. During previous surveillance of the home, the police department learned the footpath outside the home was also used to transport drugs. *Id.* However, the footpath was not included in the warrant. *Id.* While executing the warrant, officers were stationed at both ends of the footpath with instructions to "secure and detain any person found on the footpath." *Id.* During the execution of the warrant, Donald Anderson and a woman were on the footpath but stepped off the path "in a quick manner" after observing the officers. *Id.* at 444-45, 783 S.E.2d at 53. One of the officers ran towards Anderson with his gun drawn, telling Anderson to stop and get on the ground. *Id.* Anderson cooperated and was handcuffed and searched. *Id.* The officer found crack cocaine in one of Anderson's front pockets. *Id.* The supreme court held the drugs should have been suppressed "because the officer did not have reasonable suspicion that Anderson was involved in criminal activity to justify an investigative stop." *Id.* at 446-47, 449, 783 S.E.2d at 54. The court found Anderson's presence in a high crime area carried little weight because the police were in the area for the express purpose of executing a search warrant that did not include the footpath. *Id.* at 448, 783 S.E.2d at 55. The court also noted Anderson did not flee the property involved nor did the police recognize Anderson as a

suspect related to the drug crimes the police were investigating. *Id.* The court stated,

> Certainly being in a high crime area does not provide police officers carte blanche to stop any person they meet on the street. We acknowledge we are dealing with the totality of the circumstances. Nevertheless, even considering the situs with the fact that Anderson stepped off the footpath after seeing the police, we find the circumstances here fail to support the finding of reasonable suspicion.

*Id.*

■ At the time Spears was seized, the agents had observed Spears and Williams, get off a bus known by the agents to be patronized by criminals, retrieve four large bags, and appear nervous while paying close attention to the agents.[4] This evidence is insufficient to support a conclusion the agents had a "particularized and objective basis for suspecting legal wrongdoing." *Anderson*, 415 S.C. at 447, 783 S.E.2d at 54 (quoting *Arvizu*, 534 U.S. at 273, 122 S.Ct. 744).

Indisputably, Spears was a passenger on a bus sometimes patronized by criminals, which is an articulable fact. *See Anderson*, 415 S.C. at 447, 783 S.E.2d at 55 ("Although never dispositive ... being in a high crime area can be a consideration in our analysis of the totality of the circumstances."). But, like in *Anderson*, this fact carries little weight here. First, like the appellant in *Anderson*, Spears did not flee from the bus or the agents, not even when they increased their speed to stop him. Second, Spears and Williams's possession of four large bags is unparticularized given they were travelers from New York and presumably amongst many other passengers with luggage. Furthermore, luggage size is of no consequence here when the agents were interested in all types of illegal items, which are of varying size and do not all require luggage to transport. Finally, "[w]hile nervousness is a pertinent factor in determining reasonable suspicion," *Moore*, 415

---

4. All of the agents testified they were too far behind Spears and Williams to see what Williams handed to Spears or even if she handed something to Spears. Agent Tracy testified he did not include this in his report because he could not identify the object and stated that "for all he knew," Williams and Spears had "shaken hands," which he did not consider a fact. Therefore, neither will we consider this as an articulable fact.

S.C. at 254, 781 S.E.2d at 902, Spears was pursued by three agents—two of whom had their guns visible—for several hundred feet before those agents increased their speed to catch up with him. In this situation, some nervousness is to be expected. *Compare with Moore*, 415 S.C. at 254, 781 S.E.2d at 902 ("General nervousness will almost invariably be present in a traffic stop."). Also, unlike in *Anderson*, Spears at no point exhibited evasive conduct and was forthcoming with the agents until they questioned him about illegal items, but by that point, Spears had already been seized.

We recognize the agents were entitled to "make reasonable inferences regarding the criminality of [the] situation in light of [their] experience." *Robinson*, 407 S.C. at 182, 754 S.E.2d at 868. Still, reasonable suspicion requires more than a hunch. *Willard*, 374 S.C. at 134, 647 S.E.2d at 255 ("Reasonable suspicion is more than a general hunch but less than what is required for probable cause."); *see also Robinson*, 407 S.C. at 182, 754 S.E.2d at 868 ("Reasonable suspicion is something more than an 'inchoate and unparticularized suspicion' or hunch." (quoting *Terry*, 392 U.S. at 27, 88 S.Ct. 1868)). Here, the agents suspected Spears of criminal activity for getting off a bus used by criminals, having four large bags, and acting nervous. Based on the totality of the circumstances, we cannot conclude the agents' belief Spears was involved in criminal activity amounted to anything more than a hunch, which is insufficient under the Fourth Amendment. Thus, the agents seized Spears without reasonable suspicion in violation of the Fourth Amendment. Therefore, the trial court erred by denying Spears's motion to suppress.

## CONCLUSION

The trial court erred by finding the agents engaged Spears in a consensual encounter because under the totality of the circumstances, a reasonable person in Spears's position would not have felt free to leave. The trial court further erred by denying Spears's motion to suppress the drug evidence because under the totality of the circumstances, the agents did not have a reasonable suspicion Spears was involved in criminal activity. Accordingly, Spears's conviction and sentence are

**REVERSED.**

SHORT, J., concurs.

WILLIAMS, J., dissenting.

WILLIAMS, J.:

I respectfully dissent. One of the guiding principles shaping our state's Fourth Amendment jurisprudence is that, in a fact-based Fourth Amendment challenge, an appellate court is restricted by the "any evidence" standard of review. "A [circuit] court's Fourth Amendment suppression ruling must be affirmed if supported by any evidence, and an appellate court may reverse only when there is clear error." *State v. Taylor*, 401 S.C. 104, 108, 736 S.E.2d 663, 665 (2013).

Importantly, "clear error" means that the appellate court may not reverse the circuit court's findings of fact merely because it would have decided the case differently than the circuit court. *See State v. Pichardo*, 367 S.C. 84, 96, 623 S.E.2d 840, 846 (Ct. App. 2005). In my view, a faithful adherence to the "any evidence" standard of review will prevent any misconception that we have substituted our own findings in place of those of the circuit court. Therefore, in light of the evidence presented at trial and the circuit court's findings, I believe our standard of review requires an affirmance.