# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

The State, Petitioner,

v.

Eric Terrell Spears, Respondent.

Appellate Case No. 2017-001933

---

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

---

Appeal from Richland County
Robert E. Hood, Circuit Court Judge

---

Opinion No. 27945
Heard January 30, 2019 – Filed February 12, 2020

---

### REVERSED

---

Attorney General Alan McCrory Wilson, Senior Assistant Attorney General David A. Spencer, and Interim Solicitor Heather Savitz Weiss, all of Columbia, for Petitioner.

Appellate Defender LaNelle Cantey DuRant, of Columbia, for Respondent.

---

**JUSTICE JAMES:** Eric Terrell Spears was indicted for trafficking crack cocaine between ten and twenty-eight grams. Spears moved to suppress the evidence of the drugs seized from his person on the ground he was seized in violation of the Fourth Amendment. The trial court denied the motion to suppress, and Spears was

convicted as charged. The trial court sentenced Spears to thirty years in prison. A divided court of appeals reversed Spears' conviction. *State v. Spears*, 420 S.C. 363, 802 S.E.2d 803 (Ct. App. 2017). We granted the State's petition for a writ of certiorari to review the court of appeals' decision. We now reverse the court of appeals and uphold Spears' conviction. We hold there is evidence in the record to support the trial court's finding that Spears engaged in a consensual encounter with law enforcement and that Spears' subsequent actions created a reasonable suspicion that he may have been armed and dangerous—justifying law enforcement's *Terry*[1] frisk that led to the discovery of the offending crack cocaine in Spears' pants.

## I. FACTUAL AND PROCEDURAL HISTORY

Law enforcement officers from Immigration Customs Enforcement (ICE), the Drug Enforcement Agency (DEA), and the Lexington and Richland County Sheriffs' Offices were investigating a tip that two black males (Tyrone Richardson and Eric Bradley) were transporting drugs into South Carolina via one of the "Chinese bus lines." These bus lines depart from the Chinatown district in New York City, dropping off passengers in major cities along the East Coast. Because of the lack of security measures and required identification, these buses are frequently exploited by wanted criminals and people trafficking in narcotics and counterfeit merchandise. There are no traditional bus stations for the "Chinese bus line"; the buses usually stop at a couple of different locations in Columbia to allow passengers to disembark.

On March 29, 2012, Agents Dennis Tracy, Briton Lorenzen, and Frank Finch were dispatched, pursuant to the tip, to conduct surveillance at one of the bus stops. As the passengers were exiting the bus, most of the passengers were being greeted by relatives or friends, being picked up by cabs, or talking on the phone (presumably making arrangements to be picked up). However, the agents observed a man and a woman with four large suitcases who "stuck out" because "they were paying an excess amount of attention" to the plain-clothed agents. A few minutes later, the man and woman began walking down the road away from the agents. The agents followed, and while walking briskly behind the man and woman to catch up with them, the agents observed the woman remove an unknown object from her purse and pass it to the man. When the agents were approximately ten feet from the couple, they asked the couple to stop and speak with them. The couple complied and engaged the agents in a conversation. The man was identified as Spears. As they spoke, Spears kept placing his hands inside his untucked shirt near his waistband.

---

[1] *See Terry v. Ohio*, 392 U.S. 1 (1968).

Fearing Spears might have a weapon, Agent Tracy repeatedly asked Spears to stop. Spears persisted in this movement, so Agent Tracy frisked Spears for safety reasons.

During the frisk, Agent Tracy felt a small, hard object about the size of a golf ball with jagged edges tucked into Spears' waistband. Based on his training and experience, Agent Tracy believed the object was crack cocaine, and he removed it from Spears' pants. The object field-tested positive for crack cocaine, and Spears was arrested. Spears told law enforcement he was paid to bring the crack cocaine from New York to South Carolina because of the drug's higher street value in South Carolina. Spears admitted he did so out of "stupidity" and because he needed the money.

Spears was indicted for trafficking crack cocaine more than ten grams and less than twenty-eight grams. Prior to trial, Spears moved to suppress the drug evidence. Spears argued he was seized by the agents in violation of the Fourth Amendment. Specifically, he contended a seizure occurred because a reasonable person would not have felt free to walk away from the initial encounter. Spears also contended the agents did not have a reasonable suspicion to stop him. The State argued the encounter between the couple and the agents was consensual and the agents therefore did not need a reasonable suspicion to initiate the stop. The State contended Agent Tracy properly frisked Spears for safety reasons.

Agent Tracy, a nineteen-year law enforcement veteran with ten years' experience in narcotics and certified in the field of narcotics interdiction, testified during the suppression hearing. Agent Tracy testified that on the day of the incident, he and Agents Lorenzen and Finch were dressed in plain clothes and were observing passengers disembarking a bus in a parking lot near I-20. Agent Tracy testified he was carrying a concealed handgun.[2] He testified most of the passengers did not appear suspicious; however, he noted Spears and a woman appeared nervous and "kept looking at us and talking amongst themselves." Agent Tracy testified as to why the agents wanted to make contact with the couple:

> The reason . . . was to first of all identify them, and second of all to ascertain if they were involved in any criminal activity, specifically under our ICE authority it would be trafficking counterfeit goods. They have four large bags coming out of a known source area for counterfeit goods,

---

[2] Agents Lorenzen's and Finch's guns were holstered but visible. This fact was disclosed during trial testimony in front of the jury, not during the suppression hearing.

we thought that might be something we wanted to take a
look at.

Agent Tracy conceded the agents wanted to make contact with the couple solely based on their activity and not based on the original narcotics tip. Agent Tracy testified Spears and the woman began walking down the street towards the post office and that the woman appeared to reach into her bag and pass an unknown item to Spears. Agent Tracy testified that because Spears never lifted his hands above his waist, the agents believed the object would be in Spears' hands, waistband, or pockets.

Agent Tracy testified Spears and the woman continued to look back at the agents as they were walking away and that when the agents got close enough to Spears and the woman, he requested to speak with the couple. Agent Tracy testified he said something "nonthreatening" such as, "Excuse us, do you mind if we have a word with you?" Agent Tracy testified the couple complied. Agent Tracy described how the agents caught up with the couple: "They're walking, we're walking behind them, we didn't run. However, [] we [did] walk a little faster than they did to make contact with them." Agent Tracy testified Spears and the woman were not handcuffed and would have been free to walk away if they had initially refused to speak to the agents. Agent Tracy testified:

> We identified ourselves, made small talk with them about
> their travel itinerary, asked them how the bus ride was, if
> they got any bad weather[.] . . . We then asked them if
> they had -- or we told them the bus lines, that we had
> problems in the past with drugs and wanted subjects and
> counterfeit merchandise, and we asked them for ID.

Spears handed the agents his ID. However, the record does not reflect whether the agents retained his ID or gave it back to him. Agent Tracy testified Spears' answers about the trip were "very forthcoming"; however, when he asked Spears whether he had any illegal weapons, Spears hesitated before answering "no." Agent Tracy testified that based on his training in narcotics interdiction, people traditionally hesitate when they are confronted with a question they do not want to answer truthfully.

Agent Tracy testified about Spears' subsequent behavior, which is of particular importance to the issues on appeal:

> I noted that while I was speaking with [Spears,] he continued to put his hands underneath his shirt and I guess the motion would be like puff his shirt away from his waistband. . . . I asked him to keep his hands where I could see them . . . because I didn't know what if he was reaching in his pockets. He did it a couple more times, and I kept reminding him to cease putting his hands in his pockets . . . for officer safety regards[.] . . . So he continued to get frustrated, or he continued to put his hands in his pockets or pulled his shirt out, and I told him I was going to conduct a pat down of him so I could be sure he didn't have any weapons on him or anything that was going to hurt me.

Agent Tracy testified he frisked Spears for his and the other agents' safety. He testified it was during the frisk in which he discovered the crack cocaine and a small amount of marijuana.

Traci Jenkins (referred to as Traci Williams by the court of appeals), the woman with Spears at the time of the incident, also testified at the suppression hearing. She testified Spears was her boyfriend at the time of the incident. Jenkins testified she and Spears were waiting on a ride when they first disembarked the bus but decided to walk when the ride was taking too long to arrive. Jenkins testified she and Spears were told by the agents to "stop." She testified the encounter lasted probably less than twenty minutes and that she did not believe she was free to walk away. Jenkins testified she was told by the agents to sit down; however, she recalled that particular instruction was likely given to her after Spears was searched and handcuffed. She was unsure as to whether the agents' guns were visible. Spears did not testify at the suppression hearing.

The trial court denied Spears' motion to suppress the crack cocaine. The trial court found the agents engaged Spears in a consensual encounter and that Agent Tracy "pointed to specific and articulable facts [that] warranted a search of Spears' person."

During trial, Agents Tracy, Lorenzen, and Finch testified about their encounter with Spears. Tara Kinney, a forensic chemist, identified the seized drug as crack cocaine and determined it had a net weight of 11.43 grams. When the State moved the drug into evidence, Spears renewed his pretrial objection to its admissibility. The jury convicted Spears of trafficking crack cocaine, and because

this was Spears' third offense, the trial court imposed a thirty-year sentence pursuant to section 44-53-375(C)(1)(c) of the South Carolina Code (2018).

Spears appealed, and a divided court of appeals reversed his conviction. *State v. Spears*, 420 S.C. 363, 802 S.E.2d 803 (Ct. App. 2017). The majority held Spears was seized under the Fourth Amendment at the time of the initial encounter because a reasonable person would not have felt free to walk away from the agents at that point. *Id.* at 369-72, 802 S.E.2d at 806-08. The majority found Spears was arguably seized the moment the agents made initial contact with him, but, at the latest, he was seized when Agent Tracy asked whether Spears had any weapons or illegal items. *Id.* at 371, 802 S.E.2d at 807. The majority recognized the trial court did not rule as to whether the agents had a reasonable suspicion to stop Spears since the trial court's ruling was based on the premise that Spears and the agents engaged in a consensual encounter. *Id.* at 372 n.3, 802 S.E.2d at 808 n.3. However, in the interest of judicial economy, finding a remand unnecessary, the majority held the agents did not have a reasonable suspicion to seize Spears—thereby violating Spears' Fourth Amendment rights. *Id.* at 372-76, 802 S.E.2d at 808-10. The majority held the trial court erred in denying Spears' suppression motion. *Id.* at 376, 802 S.E.2d at 810.

The dissent at the court of appeals believed the appellate court's deferential standard of review in Fourth Amendment cases required the court of appeals to affirm. The dissent noted "a faithful adherence to the 'any evidence' standard of review will prevent any misconception that we have substituted our own findings in place of those of the [trial] court." *Id.* at 377, 802 S.E.2d at 810 (Williams, J., dissenting). This Court granted the State's petition for a writ of certiorari to review the court of appeals' decision.

## II. ISSUE

Did the court of appeals err in reversing the trial court's denial of Spears' motion to suppress?

## III. STANDARD OF REVIEW

"On appeals from a motion to suppress based on Fourth Amendment grounds, this Court applies a deferential standard of review and will reverse if there is clear error." *State v. Tindall*, 388 S.C. 518, 521, 698 S.E.2d 203, 205 (2010). "[T]his deference does not bar this Court from conducting its own review of the record to determine whether the trial judge's decision is supported by the evidence." *Id.* If there is any evidence to support the trial judge's decision, this Court will affirm. *State v. Brockman*, 339 S.C. 57, 66, 528 S.E.2d 661, 666 (2000). "The 'clear error'

standard means that an appellate court will not reverse a trial court's finding of fact simply because it would have decided the case differently." *State v. Pichardo*, 367 S.C. 84, 96, 623 S.E.2d 840, 846 (Ct. App. 2005) (citing *Easley v. Cromartie*, 532 U.S. 234, 242 (2001)).

## IV.  DISCUSSION

The State argues the court of appeals erred in reversing the trial court's decision to deny Spears' suppression motion.  The State contends the court of appeals failed to properly apply the standard of review and substituted its own findings in place of the trial court's findings.  The State argues there is evidence in the record to support the trial court's finding that law enforcement engaged Spears in a consensual street encounter that only became a seizure when law enforcement necessarily performed a *Terry* frisk.  We agree.

### A. Seizure

Spears unquestionably possessed Fourth Amendment rights as he walked down the street, for "the Fourth Amendment protects people, not places." *See Katz v. United States*, 389 U.S. 347, 351 (1967).  "The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures.  Evidence seized in violation of the Fourth Amendment must be excluded from trial." *State v. Khingratsaiphon*, 352 S.C. 62, 69, 572 S.E.2d 456, 459 (2002).  The Fourth Amendment guarantee "protects against unreasonable searches and seizures, including seizures that involve only a brief detention." *Pichardo*, 367 S.C. at 97, 623 S.E.2d at 847 (citing *United States v. Mendenhall*, 446 U.S. 544, 551 (1980)).  "This inestimable right of personal security belongs as much to the citizen on the streets of our cities as to the homeowner closeted in his study to dispose of his secret affairs." *Terry v. Ohio*, 392 U.S. 1, 8-9 (1968).

"A person has been seized within the meaning of the Fourth Amendment at the point in time when, in light of all the circumstances surrounding an incident, a reasonable person would have believed that he was not free to leave." *Robinson v. State*, 407 S.C. 169, 181, 754 S.E.2d 862, 868 (2014).  In other words, when law enforcement "accosts an individual and restrains his freedom to walk away, [law enforcement] has 'seized' that person." *Terry*, 392 U.S. at 16.  "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Id.* at 19 n.16.

However, not all personal intercourse between law enforcement and citizens triggers Fourth Amendment concerns.  *Id.*  The United States Supreme Court has

made it clear that "a seizure does not occur simply because a police officer approaches an individual and asks a few questions." *Florida v. Bostick*, 501 U.S. 429, 434 (1991). "[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions." *Id.* at 434 (quoting *Florida v. Royer*, 460 U.S. 491, 497 (1983)). "While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response." *I.N.S. v. Delgado*, 466 U.S. 210, 216 (1984). "What has evolved from our cases is a determination that an initially consensual encounter between a police officer and a citizen can be transformed into a seizure or detention within the meaning of the Fourth Amendment, 'if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *Id.* at 215 (quoting *Mendenhall*, 446 U.S. at 554).

There is not "a litmus-paper test for distinguishing a consensual encounter from a seizure." *Royer*, 460 U.S. at 506. Rather, "there will be endless variations in the facts and circumstances, so much variation that it is unlikely that the courts can reduce to a sentence or a paragraph a rule that will provide unarguable answers to the question whether there has been an unreasonable . . . seizure in violation of the Fourth Amendment." *Id.* at 506-07.

Here, in denying Spears' motion to suppress, the trial court pointed to certain facts in the record to support a finding that the encounter was consensual. The trial court found: (1) law enforcement initiated a conversation with Spears; (2) Spears willingly stopped and spoke with law enforcement; (3) law enforcement notified Spears they were law enforcement; (4) law enforcement never told Spears he was not free to leave; and (5) Spears was originally forthcoming with his answers to law enforcement's questions until he was asked about having anything illegal on his person.

The court of appeals held the trial court's characterization of the evidence ignored the totality of the circumstances. *See Spears*, 420 S.C. at 371, 802 S.E.2d at 807. The court of appeals concluded a reasonable person in Spears' position would not have felt free to terminate the encounter and go about his business. *Id.* at 372, 802 S.E.2d at 807. In so concluding, the court of appeals cited the framework it employed in *State v. Williams*, 351 S.C. 591, 600, 571 S.E.2d 703, 708 (Ct. App. 2002), to determine whether a seizure had occurred:

Although no single factor dictates whether a seizure has occurred, courts have identified certain probative factors, including the time and place of the encounter, the number of officers present and whether they were uniformed, the length of the detention, whether the officer moved the person to a different location or isolated him from others, whether the officer informed the person he was free to leave, whether the officer indicated to the person that he was suspected of a crime, and whether the officer retained the person's documents or exhibited threatening behavior or physical contact.

The court of appeals concluded most of the factors it enumerated in *Williams* to be probative of whether Spears had been seized:

Spears and [Jenkins] were approached by three agents, two of whom had their guns visible; the agents waited to engage Spears and [Jenkins] until they were alone; the agents did not inform Spears and [Jenkins] they were free to leave; Agent Tracy indicated Spears was suspected of a crime by following Spears, telling him the bus lines were known for illegal activity, and asking him if he had any illegal weapons or items on his person or in his property; and the agents exhibited threatening behavior by following Spears and [Jenkins] for several hundred feet before the agents increased their pace to catch up with Spears and [Jenkins].

*Spears*, 420 S.C. at 371, 802 S.E.2d at 807. The court of appeals found "particularly significant" the fact that "the agents increased their speed to catch up with Spears," indicating Spears was no longer free to continue to walk away. *Id.* at 371-72, 802 S.E.2d at 807. The court of appeals held that although Spears was arguably seized when the agents made contact with him, Spears was seized, at the latest, when Agent Tracy inquired as to whether Spears had any weapons or illegal items on his person or in his property. *Id.* at 371, 802 S.E.2d at 807. Even though Traci Jenkins was unsure whether the officers' guns were visible, the court of appeals found the visibility of the guns to be a factor in the analysis. *Id.*

We disagree with the court of appeals and find the facts and circumstances as a whole support the trial court's finding that Spears engaged in a consensual encounter with law enforcement and was not seized until he was frisked by Agent

Tracy. The court of appeals erred in finding that the trial court ignored the totality of the circumstances; the trial court simply considered the facts of this case and, in its broad discretion, determined Spears' encounter with law enforcement was consensual up until the moment Agent Tracy frisked Spears. The deferential standard for reviewing the trial court's ruling compels our reversal of the court of appeals. When facts in the record support the trial court's decision, an appellate court cannot reweigh the facts to support its own conclusions.

Specifically, there is evidence in the record to support a finding that a reasonable person would have felt free to walk away from the encounter up until the point of being told an agent was going to frisk him. The evidence supports the conclusion that after Spears and Jenkins disembarked a bus known for harboring illegal activity, they paid undue attention to the three plain-clothed agents. The three agents followed Spears and Jenkins down a public street and sped up to a brisk walk to catch up with the couple to see if the couple would answer some questions. The agents did not move Spears and Jenkins to an isolated place to speak to them. The record supports the conclusion that when the agents reached Spears and Jenkins, Agent Tracy, in a "nonthreatening" manner, asked if the couple would stop and speak with the agents. Spears complied, engaged in small-talk with the agents, and gave them his ID; Agent Tracy informed Spears in general terms about prior issues involving illegal activity on the buses and did not accuse Spears of committing a crime. Agent Tracy then inquired as to whether Spears had any weapons or illegal items. Again, the trial court's ultimate finding that a reasonable person would have felt free to walk away from the encounter is supported by the evidence.

We reject Spears' contention that the only conclusion the trial court could have reached was that a reasonable person would not have felt free to walk away from the encounter. The evidence supports a finding that the agents' goal was not to impede Spears' movement and that he was free to walk away from the encounter up until the time he was frisked. As noted previously, Jenkins testified she felt she was not free to walk away from the encounter; however, she testified her impression she was not free to leave arose only *after* Spears was searched, the drugs were found, and Spears was handcuffed. Even if Jenkins believed she was not free to leave before then, the law requires us to discount her subjective belief, as our analysis must be based upon whether a "reasonable person" would have felt free to decline the agents' requests or otherwise terminate the encounter. *See Bostick*, 501 U.S. at 436.

While we acknowledge many of the *Williams* factors might apply in any given case, we decline to expressly adopt the specific factor test enumerated in *Williams*; we believe a proper determination of whether a seizure occurred involves a broader analysis of the totality of circumstances and does not lend itself to what might be

construed as a rigid test. Nevertheless, even when we apply the *Williams* factors to this case, our deferential review of the evidence supports the trial court's conclusion:

- Time and place of the encounter: Here, it was daylight, and Spears and Jenkins were walking down a public street. *See United States v. Weaver*, 282 F.3d 302, 312 (4th Cir. 2002) ("Unlike those situations that may occur in the traffic stop context, pedestrian encounters are much less restrictive of an individual's movements.").

- The number of officers present and whether they were uniformed: Three plain-clothed agents spoke with Spears and Jenkins.

- The length of the detention: The record is not clear as to the exact length; Jenkins was unsure but believed the detention likely lasted less than twenty minutes; in this case, that is not an excessive length of time.

- Whether the officer moved the person to a different location or isolated him from others: Spears was not moved into an isolated location; he walked away from the bus on his own accord. Once they caught up with Spears, the agents did not move him to a more isolated location and did not separate him from Jenkins.

- Whether the officer informed the person he was free to leave: The agents did not inform Spears he was free to leave; however, the agents did not inform Spears he was not free to leave. *See Delgado*, 466 U.S. at 216 ("While most citizens will respond to a police request, the fact that people do so, *and do so without being told they are free not to respond*, hardly eliminates the consensual nature of the response." (emphasis added)); *United States v. Ringold*, 335 F.3d 1168, 1172 (10th Cir. 2003) (refusing to view any one factor as dispositive).

- Whether the officer indicated to the person that he was suspected of a crime: Agent Tracy informed Spears in general terms of the illegal activity that often occurs on the bus line. Agent Tracy asked Spears whether he had any weapons or illegal items.

- Whether the officer retained the person's documents: Agent Tracy asked for Spears' identification. The record does not indicate whether it was or was not returned to Spears. *See Weaver*, 282 F.3d at 312 (differentiating a pedestrian

encounter from an encounter involving a traffic stop because a pedestrian can refuse to cooperate when asked for identification).

- <u>Whether the officer exhibited threatening behavior or physical contact</u>: The agents did not physically touch Spears until he was frisked, and Spears was frisked only after he refused to comply with Agent Tracy's instruction to stop reaching under his shirt. The agents did not run after Spears but walked briskly at an accelerated rate so they could reach him. Agent Tracy politely asked if Spears would speak with him, and Spears complied. Agent Tracy testified his firearm was concealed. Jenkins testified she was unsure as to whether the agents' guns were visible.

The court of appeals found important to its reasonable person analysis the fact that the agents increased their walking speed before speaking with Spears. *Spears*, 420 S.C. at 371-72, 802 S.E.2d at 807. In *Michigan v. Chesternut*, 486 U.S. 567, 574 (1988), the United States Supreme Court held law enforcement officers' pursuit of the defendant did not constitute a seizure implicating the protections of the Fourth Amendment. The officers observed a man get out of a car and approach the defendant at a street corner. *Id.* at 569. The defendant saw the officers in their patrol car and ran, and "[t]he cruiser quickly caught up with [the defendant] and drove alongside him for a short distance." *Id.* The officers observed the defendant discarding pills from his pockets as he ran. *Id.* At a pretrial hearing, the defendant moved to suppress the drugs, arguing he was seized during an "investigatory pursuit." *Id.* at 570-71. The Supreme Court disagreed with the lower court's suppression of the drugs, holding the officers' conduct would not have communicated to a reasonable person "an attempt to capture or otherwise intrude upon [the defendant's] freedom of movement." *Id.* at 575. The Supreme Court noted the record did not show "the police activated a siren or flashers; or that they commanded [the defendant] to halt, or displayed any weapons; or that they operated the car in an aggressive manner to block [the defendant's] course or otherwise control the direction or speed of his movement." *Id.* The Supreme Court provided, "While the very presence of a police car driving parallel to a running pedestrian could be somewhat intimidating, this kind of police presence does not, standing alone, constitute a seizure." *Id.*

Here, the agents briskly walking behind Spears is similar—but much less "threatening"—to the police cruiser's "investigatory pursuit" discussed in *Chesternut*. The brisk approach of the agents in the instant case did not automatically morph a street encounter into a seizure. A finding of a seizure in this context could create the absurd result of law enforcement officers only being able to

ask questions of individuals who were standing still, walking slowly, or walking toward the officers. Law enforcement does not have unlimited license to deploy interdiction efforts or engage in general policing; however, legitimate efforts in these areas would be unrealistically restricted if law enforcement was not permitted to walk fast in an effort to speak to a pedestrian on a public street. Walking briskly towards a suspect may, in any given case be interpreted differently based on the totality of the circumstances; however, in this case, the record supports the finding that the agents walked briskly to catch up with Spears and Jenkins as a matter of practicality—not as a show of authority to restrain Spears' liberty. Spears was free to continue walking and to refuse the agents' request that he speak with them. *See Mendenhall*, 446 U.S. at 554 ("[C]haracterizing every street encounter between a citizen and the police as a 'seizure,' while not enhancing any interest secured by the Fourth Amendment, would impose wholly unrealistic restrictions upon a wide variety of legitimate law enforcement practices.").

The asking of incriminating questions by law enforcement does not automatically trigger Fourth Amendment protections. *See Bostick*, 501 U.S. at 434-35 ("[E]ven when [police] officers have no basis for suspecting a particular individual, they may generally ask questions of that individual, ask to examine the individual's identification, and request consent to search his or her luggage—as long as the police do not convey a message that compliance with their requests is required." (internal citations omitted)). There is no evidence in the record that the agents asked incriminating questions in a forceful or persistent manner to compel Spears' compliance. *See Ringold*, 335 F.3d at 1173 ("[T]he mere fact that officers *ask* incriminating questions is not relevant to the totality-of-the-circumstances inquiry—what matters instead is 'the manner' in which such questions were posed."); *United States v. Little*, 60 F.3d 708, 712 (10th Cir. 1995) ("Accusatory, persistent, and intrusive questioning can turn an otherwise voluntary encounter into a coercive one." (internal quotation marks omitted)). The record supports the finding that the tone of the agents' interaction with Spears was not aggressive but conversational. The evidence supports the finding that the agents simply noted to Spears, in general terms, issues in the past with people transporting illegal items on the bus line and inquired as to whether Spears had any illegal weapons or other items in his luggage or on his person. *See United States v. Wilson*, 895 F.2d 168, 170 (4th Cir. 1990) (finding no seizure occurred when a narcotics agent stopped the defendant in an airport, informed the defendant he was investigating drug trafficking, and asked the defendant if he had anything illegal in his possession).

Spears dwells on the fact that Agents Lorenzen's and Finch's firearms were visible. The court of appeals also found this fact important to its analysis. Spears

argues, "It was not consensual because Spears did not feel free to leave with police guns facing him." First, the fact that Agents Lorenzen's and Finch's firearms were visible was never argued to the trial court during the suppression hearing. This fact did not surface until trial. Second, even if it had been argued during the suppression hearing, Spears' statement improperly characterizes and inflates the impact of the agents' firearms and ignores the fact that both agents' firearms remained holstered during the entire encounter. It is common knowledge a law enforcement officer carries a holstered weapon, concealed or visible. The record does not indicate the agents displayed their firearms in a manner that would cause a reasonable person to feel he could not walk away. This conclusion is supported by the fact that Traci Jenkins was unsure if the officers' guns were even visible. It would be unrealistically restrictive and unsafe for a law enforcement officer to have to remove his firearm and leave it elsewhere before approaching and questioning a person on the street. We hold, under the facts of this case, the court of appeals erred in concluding the "display" of handguns in Lorenzen's and Finch's holsters would have caused a reasonable person to feel he was not free to leave the encounter.

Spears is a black male. During oral argument, this Court inquired as to whether Spears' race was a factor to be considered in determining whether a reasonable person would have felt free to terminate the encounter with law enforcement and continue walking. Spears did not argue this point during the suppression hearing or to the court of appeals or in his brief to this Court; in fact, he contended *no one* would have felt free to leave this encounter. Even though the issue is not before us, we will briefly address it.

In *Mendenhall*, the defendant, a black female, was approached by DEA agents in the concourse of the Detroit Metropolitan Airport after she exhibited behavior the agents believed to be characteristic of a person carrying illegal drugs. 446 U.S. at 547. The agents approached the defendant and began asking her questions about her flight documentation. *Id.* at 548. The defendant appeared "extremely nervous" and, according to the agents, provided inconsistent accounts about her flight documentation. *Id.* An agent asked the defendant if she would accompany him to the airport DEA office for further questions. *Id.* The defendant acquiesced and, after being escorted to a private office, consented to a search of her person by a female agent. *Id.* at 548-49. Two packages of heroin were found, and the defendant was arrested. *Id.* at 549. The district court denied the defendant's motion to suppress, and the defendant was convicted of possessing heroin with the intent to distribute. *Id.*

The United States Supreme Court held the original encounter did not constitute a seizure. *Id.* at 555. When discussing whether the agent's request for the

defendant to accompany him to the airport DEA office constituted a seizure, the Court concluded, "The question whether the [defendant's] consent to accompany the agents was in fact voluntary or was the product of duress or coercion, express or implied, is to be determined by the totality of all the circumstances." *Id.* at 557. The Court noted the defendant's age and education and stated, "It is additionally suggested that the [defendant], a [black female], may have felt unusually threatened by the officers, who were white males. While these factors were not irrelevant, . . . neither were they decisive[.]" *Id.* at 558. The United States Supreme Court ultimately held the totality of the evidence was sufficient to support the trial court's finding that the defendant voluntarily consented to accompany the agents to the DEA office. *Id.*

In *United States v. Smith*, the defendant argued the Fourth Amendment reasonable person analysis should consider the defendant's race. 794 F.3d 681, 687 (7th Cir. 2015). The defendant specifically argued "no reasonable person in his 'position'—as a young black male confronted in a high-crime, high-poverty, minority-dominated urban area where police-citizen relations are strained—would have felt free to walk away from the encounter" with the law enforcement officers. *Id.* at 687-88. The Seventh Circuit Court of Appeals stated:

> We do not deny the relevance of race in everyday police encounters with citizens in Milwaukee and around the country. Nor do we ignore empirical data demonstrating the existence of racial profiling, police brutality, and other racial disparities in the criminal justice system. But today we echo the sentiments of the Court in *Mendenhall* that while [the defendant's] race is "not irrelevant" to the question of whether a seizure occurred, it is not dispositive either.

*Id.* at 688.

The Tenth Circuit Court of Appeals has concluded differently, rejecting the argument that race is an appropriate consideration in the reasonable person analysis. *See United States v. Easley*, 911 F.3d 1074, 1081-82 (10th Cir. 2018), *cert. denied*, 2019 WL 1886117 (U.S. Apr. 29, 2019). The Tenth Circuit distinguished *Mendenhall*, finding its discussion of race was limited to the context of assessing voluntariness, not seizure. *Id.* at 1081. The Tenth Circuit explained:

> Requiring officers to determine how an individual's race affects her reaction to a police request would seriously

complicate Fourth Amendment seizure law. As the government notes, there is no easily discernable principle to guide consideration of race in the reasonable person analysis. . . . There is no uniform life experience for persons of color, and there are surely divergent attitudes toward law enforcement officers among members of the population. Thus, there is no uniform way to apply a reasonable person test that adequately accounts for racial differences consistent with an objective standard for Fourth Amendment seizures.

*Id.* at 1082.

We need not consider whether Spears' race is a factor to be considered when resolving the issue of whether the encounter was consensual. The trial record contains no evidence on this point other than the fact that Spears is a black male, and Spears advanced no argument on this point to the trial court, thus rendering the issue unpreserved.

There is evidence in the record to support the trial court's conclusion that the encounter was consensual. We reverse the court of appeals on this point and hold Spears was not seized until he was frisked by Agent Tracy. Consequently, until the frisk, the Fourth Amendment was not implicated, and there was no requirement of a showing of reasonable suspicion that Spears was engaged in criminal activity. *See Bostick*, 501 U.S. at 434 (providing as long as the encounter remains consensual, it does not trigger Fourth Amendment scrutiny, and there is no requirement of a showing of reasonable suspicion of criminal activity).

### B. Legality of the Frisk

We next address the legality of the frisk. Giving due consideration to the evidence in the record, we conclude the law requires us to sustain the trial court's finding that the frisk was justified.

"[B]efore the police may frisk a defendant, they must have a reasonable belief the defendant is armed and dangerous." *State v. Fowler*, 322 S.C. 263, 267, 471 S.E.2d 706, 708 (Ct. App. 1996). "In other words, a reasonable person in the position of the officer must believe the frisk was necessary to preserve the officer's safety." *Id.* "In assessing whether a suspect is armed and dangerous, the officer need not be absolutely certain the individual is armed." *State v. Blassingame*, 338 S.C. 240, 248-49, 525 S.E.2d 535, 540 (Ct. App. 1999). A protective frisk may be employed after

either an investigative stop or a consensual encounter. *United States v. Ellis*, 501 F.3d 958, 961 (8th Cir. 2007) (citing *United States v. Davis*, 202 F.3d 1060, 1063 (8th Cir. 2000)). *Terry* dictates that even in the setting of a protective frisk, "it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" 392 U.S. at 21-22 (quoting *Carroll v. United States*, 267 U.S. 132, 162 (1925)).

The trial court concluded Agent Tracy had a reasonable suspicion that Spears was armed and dangerous and was therefore justified in frisking Spears. The trial court stated, "Now the only justification for patting down the defendant is a reasonable belief that his safety or the safety of others was in danger. Law enforcement has pointed to specific and articulable facts which warranted a search of the defendant's person." Evidence in the record supports the trial court's finding. First, Agent Tracy was a veteran law enforcement officer with a certification in interdiction. *See State v. Moore*, 415 S.C. 245, 255, 781 S.E.2d 897, 902 (2016) (citing a law enforcement officer's "extensive experience" in drug interdiction in support of common sense judgments); *United States v. Lender*, 985 F.2d 151, 154 (4th Cir. 1993) ("Courts are not remiss in crediting the practical experience of officers who observe on a daily basis what transpires on the street."). Such experience in law enforcement and interdiction lends support to the common sense judgments Agent Tracy made during the encounter. Also, Agent Tracy's testimony supports a finding that Spears kept placing his hands underneath his shirt near his waistband and "would puff his shirt away from his waistband." Agent Tracy asked Spears not to do this because he wanted to see Spears' hands to make sure Spears was not reaching for a weapon. Despite being asked several times to not make this "puffing" motion under his shirt, Spears did not comply. Only after Spears continued to disobey Agent Tracy's request did Agent Tracy fear for his safety and find it necessary to frisk Spears. We affirm the trial court's ruling that the frisk was justified.

## V. CONCLUSION

There is evidence in the record to support the trial court's finding that Spears engaged in a consensual encounter with law enforcement, and there is evidence in the record to support the trial court's finding that Agent Tracy was justified in frisking Spears. Consequently, the trial court properly denied Spears' motion to suppress evidence of the crack cocaine seized during the frisk. We reverse the court of appeals and reinstate Spears' conviction and sentence.

**REVERSED.**

**FEW, J., concurs. HEARN, J., concurring in a separate opinion. BEATTY, C.J., dissenting in a separate opinion in which Acting Justice John D. Geathers, concurs.**

**JUSTICE HEARN:** I concur but write separately because I share many of the dissent's concerns regarding whether Eric Spears—an African-American male—*actually* felt free to walk away from the encounter with law enforcement. While I am skeptical that he did, this does not change the fact that our standard of review requires us to affirm unless there is clear error, meaning we cannot substitute our judgment for that of the trial court. *State v. Cardwell*, 425 S.C. 595, 599, 824 S.E.2d 451, 453 (2019) ("The 'clear error' standard means that an appellate court will not reverse a trial court's finding of fact simply because it would have decided the case differently."). Further, as pointed out by the majority, Spears never raised the argument the dissent advances to the trial court, where it would have had the opportunity to specifically address this issue when deciding whether he was seized pursuant to the totality of the circumstances. Indeed, had Spears raised this issue to the trial court and briefed it before this Court, we would be in a position to consider the reasoning of the dissent. Instead, this important discussion originated from the bench, and the record contains nothing to enable us to alter our jurisprudence as the dissent suggests. Accordingly, I concur.

**CHIEF JUSTICE BEATTY:** I respectfully dissent. I agree with the majority of the Court of Appeals and would find: (1) Spears was seized under the Fourth Amendment because a reasonable person would not have felt free to terminate the encounter with law enforcement; and (2) law enforcement did not have reasonable suspicion to justify the seizure. Accordingly, I would conclude the trial court erred in denying Spears's motion to suppress.

## A. Seizure

The Fourth Amendment to the United States Constitution protects a person's right to be free from unreasonable searches and seizures. U.S. Const. amend. IV. Not every interaction between law enforcement and a citizen constitutes a seizure. *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968). "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry*, 392 U.S. at 19 n.16.

"[T]o determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Florida v. Bostick*, 501 U.S. 429, 439 (1991); *see Robinson v. State*, 407 S.C. 169, 181, 754 S.E.2d 862, 868 (2014) ("A person has been seized within the meaning of the Fourth Amendment at the point in time when, in light of all the circumstances surrounding an incident, a reasonable person would have believed that he was not free to leave." (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980))).

The threshold question in this case is whether Spears was seized. The determination of this issue hinges on how a reasonable person would perceive the encounter with law enforcement. Our Fourth Amendment jurisprudence does not take into account personal characteristics such as race, sex, age, disability, and so forth when making this determination. The test does, however, consider the totality of the circumstances. In my view, a true consideration of the totality of the circumstances cannot ignore how an individual's personal characteristics—and accompanying experiences—impact whether he or she would feel free to terminate an encounter with law enforcement.

Spears is an African-American male. Scholars have examined ad nauseam the dynamics between marginalized groups—particularly African-Americans—and

law enforcement.[3]  African-Americans generally experience police misconduct and brutality at higher levels than other demographics.[4]  Consequently, it is no surprise that scholars have also found African-Americans often perceive their interactions with law enforcement differently than other demographics.  "For many members of minority communities, however, the sight of an officer in uniform evokes a sense of fear and trepidation, rather than security."  Robert V. Ward, *Consenting to a Search and Seizure in Poor and Minority Neighborhoods: No Place for a "Reasonable Person"*, 36 How. L.J. 239, 247 (1993).  Moreover, "[g]iven the mistrust by certain racial, ethnic, and socioeconomic groups, an individual who has observed or experienced police brutality and disrespect will react differently to inquiries from law enforcement officers . . . .").  *Id.* at 253.  Unfortunately, under our existing framework, this can result in the evisceration of Fourth Amendment protections for many people of color.

Courts have also noted the existence of racial disparities in policing.

[O]ur court addressed at length "the burden of aggressive and intrusive police action that falls disproportionately on African-American, and sometimes Latino, males" and observed that "as a practical matter

---

[3] *See, e.g.*, Charles R. Epp et al., *Beyond Profiling: The Institutional Sources of Racial Disparities in Policing*, 77 Pub. Admin. Rev. 168 (2017); Emily Ekins, The Cato Inst., *Policing in America: Understanding Public Attitudes Toward the Police. Results from a National Survey* (2016).

[4] *See, e.g.*, Epp, *supra*, at 174 ("Simply put, investigatory stops of vehicles especially target minority communities and people of color."); Ekins, *supra*, at 30 ("African Americans are about twice as likely as whites to report profanity or knowing someone physically mistreated by the police."); Scottie Andrew, *Police Are Three Times More Likely to Kill Black Men, Study Finds: 'Not a Problem Confined to a Single Region'*, Newsweek (July 23, 2018, 1:41 PM), https://www.newsweek.com /black-men-three-times-likely-be-killed-police-1037922 ("Across the country, black men are over three times more likely to be killed by police than white men, according to a study . . . ."); Maggie Fox, *Police Killings Hit People of Color Hardest, Study Finds*, NBC News (May 8, 2018, 8:00 AM), https://www.nbcnews.com/health/ health-news/police-killings-hit-people-color-hardest-study-finds-n872086  ("While just over half of people killed by police are white, Hispanics and African-Americans are on average younger, the researchers found. And people of black, Hispanic and Native American background are disproportionately killed by police, they reported.").

neither society nor our enforcement of the laws is yet colorblind." There is little doubt that uneven policing may reasonably affect the reaction of certain individuals—including those who are innocent—to law enforcement.

*United States v. Brown*, 925 F.3d 1150, 1156 (9th Cir. 2019) (quoting *Washington v. Lambert*, 98 F.3d 1181, 1187–88 (9th Cir. 1996)).  United States Supreme Court Justice Sonia Sotomayor has intimated:

> But it is no secret that people of color are disproportionate victims of this type of scrutiny.  For generations, black and brown parents have given their children "the talk"—instructing them never to run down the street; always keep your hands where they can be seen; do not even think of talking back to a stranger—all out of fear of how an officer with a gun will react to them.

*Utah v. Strieff*, 136 S. Ct. 2056, 2070 (2016) (Sotomayor, J., dissenting) (internal citations omitted); *see Floyd v. City of New York*, 959 F. Supp. 2d 540 (S.D.N.Y. 2013) (finding the City of New York liable for the New York Police Department's stop-and-frisk policy, which violated plaintiffs' constitutional rights, and noting the racial disparities in the policy's implementation).

In spite of these academic findings and judicial observations, our current framework fails to meaningfully consider the ways in which a person's race can influence their experience with law enforcement.  As a result, I fear minority groups are not always afforded the full protections of the Fourth Amendment.  Given the interests at stake, one would expect our criminal justice system to forcefully resist marginalizing the experiences of people of color by insisting on a "color-blind" reasonable person standard.  *See* Ward, *supra*, at 241 ("Because the reasonable person test assumes that a person's interactions with the police is a generic experience, the test is biased.").  In my opinion, the seizure analysis should consider whether a reasonable *Black* person felt free to end an encounter with police.  At the very least, I believe courts should consider a person's race (and other personal characteristics) in examining the totality of the circumstances in a seizure analysis.[5]

---

[5] For example, in analyzing the totality of the circumstances to determine whether a defendant was seized, the Ninth Circuit acknowledged, among other things, "the publicized shooting by white Portland police officers of African-Americans" and "the widely distributed pamphlet with which [the defendant] was familiar,

Notwithstanding the foregoing, Spears's status as an African-American male is not the only circumstance militating against a conclusion that this was a consensual encounter. I agree with the Court of Appeals' determination that Spears was seized at the earliest when the officers made contact with him, and at the latest when the officers asked him whether he possessed any illegal items. Prior to the stop, the police followed Spears approximately 500 feet from the bus stop and walked at a brisk pace to catch up to him. Once Spears stopped to engage with the police, an officer explained there had been "problems in the past with drugs and wanted subjects and counterfeit merchandise." The officer also inquired about Spears's trip and asked for his identification. Subsequently, the officer asked Spears whether he had any illegal items on him or his property.

Under the totality of the circumstances, a reasonable person in Spears's shoes would not feel free to terminate the encounter with law enforcement. Spears was aware that he was being followed by three police officers.[6] The agents followed him to a more isolated area and quickened their pace to catch up to him. In my view, a reasonable person in this situation would not feel free to continue walking and disregard the agent's request to talk.[7] As the Court of Appeals pointed out— correctly, in my opinion—the agents signaled to Spears that he was no longer free to continue walking when they increased their speed to catch up to him. Accordingly, Spears was arguably seized as soon as the police initiated contact.

Even assuming the initial contact between Spears and the agents did not amount to a seizure, Spears was undoubtedly seized when the agent asked Spears

instructing the public to comply with an officer's instructions." *United States v. Washington*, 490 F.3d 765, 773 (9th Cir. 2007).

[6] Agent Tracy testified that Spears kept looking back at the agents as they were following him. Agents Finch and Lorenzen testified that their guns and badges were visible.

[7] I question what would have happened had Spears continued walking and ignored the agent's request to speak with him. Indeed, had Spears continued to walk away, the agents may have interpreted this as furtive behavior that created reasonable suspicion for a stop. *See State v. Taylor*, 401 S.C. 104, 736 S.E.2d 663 (2013) (finding reasonable suspicion existed where the defendant attempted to avoid officers by riding away on his bicycle). The Fourth Amendment could not possibly intend to place citizens in this impossible catch-22 situation.

whether he possessed any illegal items.  As mentioned, when Spears stopped to talk with the agents, he was aware the agents had been following him.[8]  After asking a few general questions, the agent stated there had been "problems" on the bus lines with "drugs and wanted subjects and counterfeit merchandise."  The agent then asked Spears for identification and inquired whether Spears possessed any illegal items.

In my view, under these circumstances, a reasonable person would feel like he or she was suspected of wrongdoing and thus obligated to comply with the agent's requests.[9]  Indeed, this is the only logical conclusion a person in Spears's situation

---

[8] In *United States v. Jones*, the Fourth Circuit examined whether a defendant was seized when the officers blocked his car from leaving the scene.  678 F.3d 293 (2012).  While the facts in *Jones* obviously differ and can be distinguished from the instant case, I find the Fourth Circuit's analysis compelling.  In *Jones*, the court noted "the encounter here began with a citizen knowing that the police officers were conspicuously following him, rather than a citizen, previously unaware of the police, being approached by officers seemingly at random."  *Id.* at 300.  The court also made much of the fact that the defendant in *Jones* was seemingly *targeted* by the officers.  "[H]ere, the totality of the circumstances would suggest to a reasonable person in Jones's position that the officers suspected him of some sort of illegal activity in a 'high crime area,' which, in turn, would convey that he was a target of a criminal investigation and thus not free to leave or terminate the encounter."  *Id.* at 304.

[9] In *State v. Contreras*, a New Jersey appellate court concluded an encounter between the defendants and police officers was a seizure.  In making this determination, the court stated:

> The officers proceeded to explain that there are 'problems' with drugs, weapons, and other contraband being transported on the trains between New York and New Jersey.  They then asked defendants if they were carrying any such contraband, a question that clearly conveyed to defendants the message that the officers suspected them of criminal activity.

742 A.2d 154, 160 (1999).  Similarly, in *State v. Pitts*, the Supreme Court of Vermont detailed several cases in other jurisdictions and noted there has been "a recognition among many courts that while 'mere questioning' may not constitute a seizure per se, pointed questions about drug possession or other illegal activity in circumstances indicating that the individual is the subject of a particularized investigation may convert a consensual encounter into a *Terry* stop requiring objective and articulable suspicion under the Fourth Amendment."  978 A.2d 14, 19–21 (Vt. 2009).  The court ultimately found the defendant was seized, stating:  "Although the officers' first few

could draw. This was not a situation in which the officers questioned passengers at random as they disembarked—Spears was singled out, followed, and questioned. Therefore, under the totality of the circumstances, I do not believe a reasonable person in this situation would feel at liberty to terminate the encounter with law enforcement. Accordingly, I would find Spears was seized under the Fourth Amendment.

I also wish to address the State's and majority's reliance on *Michigan v. Chesternut*, 486 U.S. 567 (1988), as I believe that case is readily distinguished. In *Chesternut*, the police observed a man get out of a car and approach the defendant. 486 U.S. at 569. When the defendant saw the marked police cruiser approach the corner where he was standing, he turned and ran. *Id.* The cruiser caught up to the defendant and "drove alongside him for a short distance." *Id.* As the cruiser drove alongside the defendant, he retrieved several packets from his pocket and discarded them. *Id.* An officer got out of the car to examine the packets (which contained pills), and the defendant stopped running while the officer was examining the packets. *Id.*

The majority compares the agents' brisk walk behind Spears to the police cruiser's "investigatory pursuit" in *Chesternut* and finds the agents' behavior here "much less 'threatening.'" At the outset, I note the United States Supreme Court expressly limited its holding in *Chesternut* to the particular facts in that case. *Id.* at 572–73 ("Rather than adopting either rule proposed by the parties and determining that an investigatory pursuit is or is not necessarily a seizure under the Fourth Amendment, we adhere to our traditional contextual approach, and determine only that, in this particular case, the police conduct in question did not amount to a seizure."). Additionally, there are significant factual differences between *Chesternut* and this case. In *Chesternut*, the officers never commanded or asked the defendant to stop. Here, the agents effectuated a seizure when they asked Spears if they could speak with him. Unlike the police officers in *Chesternut*, the agents in this case singled Spears out (among many disembarking passengers), followed him to a more isolated location, accelerated their pace to catch up to him, and initiated conversation.

Furthermore, the State and majority assert a finding of seizure in this case would lead to the "absurd result" of a blanket prohibition on an officer's ability to

---

questions to [the defendant] were the kind that courts have uniformly held to be innocuous and nonconfrontational, they rapidly progressed to inquiries indicating a particularized suspicion of criminal activity."). *Id.* at 21.

walk briskly. I disagree. Here, the agents' pursuit of Spears is just one of many circumstances to be considered, and the case does not turn solely on the speed at which the agents walked. Because a court must always examine the totality of the circumstances in determining whether a seizure occurred, the specific manner in which an officer approaches a defendant will remain just one of many facts a court must consider.

The State also contends upholding the Court of Appeals' decision will jeopardize officer safety if police can no longer ask a person whether they possess any illegal weapons. However, the agents did not ask Spears whether he had any illegal *weapons*. Rather, the agents asked Spears whether he had any illegal *items*.

## B. Reasonable Suspicion

After determining Spears was seized, the question becomes whether law enforcement had a reasonable suspicion of criminal activity to warrant the seizure. *See Florida v. Royer*, 460 U.S. 491, 512 (1983) ("To justify such a seizure an officer must have a reasonable suspicion of criminal activity based on 'specific and articulable facts . . . [and] rational inferences from those facts . . . .'" (quoting *Terry*, 392 U.S. at 21)).

Law enforcement initially grew suspicious of Spears because he appeared to pay an "excessive" amount of attention to the officers and seemed "nervous." According to one officer's testimony at trial, this was unusual because the agents were dressed in plain clothes. However, two officers testified that their guns and badges were visible, and one officer speculated that Spears noticed the police were not "just off the bus or . . . there to pick anybody up." In my opinion, this would suggest the presence of law enforcement at the bus stop was indeed "obvious." And, practically speaking, once a person recognizes the presence of police, they are likely to pay attention irrespective of the officers' dress. Nonetheless, there is nothing particularly incriminating about *looking* at law enforcement.

In addition to paying the agents an "excessive" amount of attention, the officers made only the following observations prior to stopping Spears: Spears and his companion arrived on a bus line known to be used by criminals; the pair retrieved four large pieces of luggage; Spears did not appear to be meeting anyone at the bus stop; Spears began walking down the road away from the bus stop; and, while walking away, Spears's companion handed him an unidentified item. In my view, none of these facts, standing alone or together, provide articulable and reasonable suspicion to justify a seizure.

Several of the aforementioned facts are entirely reasonable given the context of the situation. One would expect two people traveling to South Carolina from New York to have several pieces of luggage. Further, walking away from a bus stop after disembarking is not suspicious activity. Indeed, Spears's companion testified the pair decided to walk when their ride failed to show up. In addition, Spears walked at a normal pace even though he knew he was being followed. Moreover, not one agent could testify regarding the specifics of what Spears's companion handed him— or even if she actually handed Spears anything at all. Therefore, these facts cannot be relied upon to establish a reasonable suspicion that criminal activity was afoot.

Once these facts are dispensed with, law enforcement was left with only two facts: (1) Spears's arrival on the bus line; and (2) Spears kept looking at the agents. In *Illinois v. Wardlow*, the United States Supreme Court recognized that "presence in an area of expected criminal activity" and "nervous, evasive behavior" are both relevant—though not dispositive—in a reasonable suspicion analysis. 528 U.S. 119, 124 (2000). When considering the totality of the circumstances, these two factors alone are woefully inadequate to provide an officer with any reason to suspect Spears was engaged in criminal activity.

The Fourth Amendment requires a police officer to have more than a mere, unsupported hunch before subjecting a citizen to police intrusion. *See Robinson*, 407 S.C. at 182, 754 S.E.2d at 868 ("Reasonable suspicion is something more than an 'inchoate and unparticularized suspicion' or hunch." (quoting *Terry*, 392 U.S. at 27)). Although I am sympathetic to the everyday realities police officers face, the courts must be careful to strike an equitable balance between the needs of law enforcement and the constitutional rights of citizens. In *Schneckloth v. Bustamonte*, Justice Thurgood Marshall aptly noted the following in his dissent:

> Of course it would be 'practical' for the police to ignore the commands of the Fourth Amendment, if by practicality we mean that more criminals will be apprehended, even though the constitutional rights of innocent people also go by the board. But such a practical advantage is achieved only at the cost of permitting the police to disregard the limitations that the Constitution places on their behavior, a cost that a constitutional democracy cannot long absorb.

412 U.S. at 288 (Marshall, J., dissenting). Although *Schneckloth* addressed a different Fourth Amendment issue, I believe Justice Marshall's words are equally applicable here.

The United States population includes 42 million Americans of African descent. Inexplicably, these Americans are basically invisible to those of us who apply the analytical framework for reasonable behavior or beliefs. Somehow the judiciary, intentionally or not, excludes these Americans' normal behaviors, responses, and beliefs in circumstances involving law enforcement agents. For most, the "totality of the circumstances" does not include consideration of the reasonable behavior or response of African-Americans when confronted with certain stimuli. Thus, the regrettable and unsettling conclusion is that the question of what is "reasonable" is viewed solely from the perspective of Americans who are White. I shudder to think about the probable result had the defendant continued to walk and ignore the police.

This unassailable observation is not intended as an indictment of my colleagues who wear the robe. I do not believe their obliviousness is due to intentional disregard. I prefer to assign their selective blindness to a lifetime of being repeatedly subjected to episodes of minimizing the African-American experience. Life experiences influence the way that we all view the world and legal issues. We should be cognizant of this fact and attempt to view the issue truly with an objective eye. An objective eye would acknowledge the fact that African-Americans are being reasonable when they respond in accordance with their collective experiences gained over two hundred years.

This fact of life observation has no bearing on the actual guilt or innocence of the defendant in this case. However, it has great significance to our Constitution, due process, equal protection, and what it means to be an American.

Based on the foregoing, I would find the trial court erred in denying Spears's motion to suppress because Spears was seized pursuant to the Fourth Amendment without any articulable and reasonable suspicion. Therefore, I would affirm the decision of the Court of Appeals.

**Acting Justice John D. Geathers, concurs.**